## KNOXVILLE WATER COMPANY *v.* KNOXVILLE.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF TENNESSEE.

No. 123.　Argued December 11, 12, 1905.—Decided January 2, 1906.

Where the bill properly sets forth the facts on which a corporation insists that the agreement under which it erected, and is operating, its plant constituted a contract whereby it acquired exclusive rights for a given period and that the obligation of that contract will be impaired by the threatened action of the municipality in erecting its own waterworks, the case is one arising under the Constitution of the United States and of which the proper Circuit Court can take cognizance without regard to the citizenship of the parties.

Only that which is granted in clear and explicit terms passes by a grant of property, franchises or privileges in which the Government or the public has an interest. Statutory grants of that character are to be construed strictly in favor of the public; whatever is not unequivocally granted is withheld; and nothing passes by implication.

Although the contract in this case between a waterworks company and a municipality provided that no contract or privilege would be granted to furnish water to any other person or corporation, the city was not, in the

absence of a special stipulation to that effect, precluded from establishing its own independent system of waterworks.

THE facts are stated in the opinion.

*Mr. Charles T. Cates, Jr.,* with whom *Mr. Samuel G. Shields* and *Mr. R. E. L. Mountcastle* were on the brief, for appellant:

The city and the Water Company both had power to enter into the contract and no other reasonable or just interpretation can be placed upon said contract than that the city thereby agreed not to erect and maintain waterworks on its own account, in competition with appellant, during the continuance of said contract.

A contract entered into within the authority of a municipal corporation receives the same construction as one entered into between individuals. The purpose of the contract was not to govern the inhabitants of the city, but to obtain a private benefit for both the city and its inhabitants, as distinguished from its governmental and legislative functions. *Illinois Trust & Savings Bank* v. *Arkansas City,* 76 Fed. Rep. 271; *Cunningham* v. *City of Cleveland,* 98 Fed. Rep. 657, 663; *Western Sav. Fund Soc.* v. *Philadelphia,* 31 Pa. St. 175; *Bailey* v. *New York,* 3 Hill (N. Y.), 531; *Brumm's Appeal,* 12 Atl. Rep. 855.

The interpretation placed by the lower court upon the contract cannot be sustained. Courts may acquaint themselves with the persons and circumstances that are the subjects of the written agreement, and place themselves in the situation of the parties who made the contract; view the circumstances as they viewed them, so as to judge of the meaning of the words, and of the correct application of the language to the thing described. *Goddard* v. *Foster,* 11 Wall. 123, 143; *Guarantee Co.* v. *Bank & Trust Co.,* 80 Fed. Rep. 766, 778.

The obligations of the parties to the contract are correlative.

Though a contract may in terms bind but one party, yet the law will imply corresponding and correlative obligations, when that is necessary to carry out the intention of the parties and

prevent the contract from being ineffectual. *Churchwarden* v. *Queen*, L. R. 1 Q. B. 173; *Barton* v. *McLean*, 5 Hill (N. Y.), 256; *Manistee Iron Works* v. *Lumber Co.*, 92 Wisconsin, 21; *D. & H. Canal Co.* v. *Penn. Coal Co.*, 8 Wall. 288.

The use of the word "exclusive" would have added nothing to the contract.

The implied duties and obligations are as much a part of a contract as those expressed. *United States* v. *Babbit*, 1 Black, 55; *Massachusetts* v. *Rhode Island*, 12 Pet. 123; *Union Depot Co.* v. *Chicago Ry. Co.*, 113 Missouri, 213; Parsons on Contracts, 8th ed., 515; *Water Co.* v. *Los Angeles*, 103 Fed. Rep. 711.

This case is governed by *Water Co.* v. *Walla Walla*, 172 U. S. 1; *Water Company* v. *Vicksburg*, 185 U. S. 65, 82; *Memphis* v. *Water Co.*, 5 Heisk. (Tenn.) 495, 500; *Cunningham* v. *Cleveland*, 98 Fed. Rep. 657; and not by *Stein* v. *Water Co.*, 141 U. S. 67; *Gas Light Co.* v. *Hamilton*, 146 U. S. 258; *Bienville Supply Co.* v. *Mobile*, 175 U. S. 109, and 186 U. S. 212; *Water Co.* v. *Skaneateles*, 184 U. S. 354; *Joplin* v. *Light Co.*, 191 U. S. 150; *Water Co.* v. *Helena*, 195 U. S. 383.

While the actions of municipal corporations are to be held strictly within the powers expressly or by necessary implication conferred upon it, yet within those limits they are to be favored by the courts. Powers expressly granted, or necessarily implied, are not to be defeated or impaired by a stringent construction. Dill. Mun. Corp., 4th ed., § 91, note 2; *Smith* v. *Madison*, 7 Indiana, 86; *Memphis* v. *Adams*, 9 Heisk. 518; *Indianapolis* v. *Gas Light Co.*, 66 Indiana, 407; *White* v. *Meadville*, 177 Pa. St. 643; *Memphis Gas Co.* v. *Williamson,* 9 Heisk. 326.

The company was obligated to comply with all the terms of the contract for thirty years and under the contract had an exclusive right in the streets for that period and the city is estopped from denying this right. *San Antonio Ry. Co.* v. *State*, 99 Texas, 520; *Northern Pacific* v. *Washington*, 152 U. S. 492; *Water Co.* v. *Knoxville*, 189 U. S. 435, both *in pais;* 2 Dillon,

Mun. Corp., 14th ed., §§ 463, 675; *Dennis* v. *Rainey,* 8 Baxt. 501; *Memphis* v. *Looney,* 9 Baxt. 129; *Sims* v. *Chattanooga,* 2 Lea (Tenn.), 695; *Land Co.* v. *Jellico,* 103 Tennessee, 320; *Gas Light Co.* v. *Memphis,* 93 Tennessee, 612, and by judgment *Knoxville* v. *Water Co.,* 107 Tennessee, 647; *S. C.,* 189 U. S. 434.

The contract was recognized and ratified by the legislature of the state.

*Mr. John W. Green,* with whom *Mr. J. W. Culton* was on the brief, for appellees:

This court has no jurisdiction; diverse citizenship does not exist and no constitutional rights are impaired. *Gas Light Co.* v. *Hamilton,* 146 U. S. 266; *New Orleans* v. *Water Co.,* 142 U. S. 79.

The city had no power to grant an exclusive franchise. All the presumptions are against the creation of an exclusive contract and appellant has failed to distinguish the cases so holding cited in its brief, and see also Cooley's Const. Lim., 4th ed., 493; *Railroad Co.* v. *Railway Co.,* 24 Fed. Rep. 306; *Turnpike Co.* v. *Montgomery County,* 100 Tennessee, 417.

The same cases hold that the public is favored by the courts where questions of this character arise, and see *Stein* v. *Bienville Co.,* 141 U. S. 67. There was no legislative authority for an exclusive grant as there was in *Gas Co.* v. *Gas Light Co.,* 115 U. S. 650; *Water Co.* v. *New Orleans,* 115 U. S. 674; *St. Tammany Water Co.* v. *New Orleans,* 120 U. S. 64, and *Louisville Gas Co.* v. *Citizens' Gas Co.,* 115 U. S. 683; *Water Co.* v. *Walla Walla,* 172 U. S. 1.

MR. JUSTICE HARLAN delivered the opinion of the court.

This suit was brought by the Knoxville Water Company, a corporation of Tennessee, against the City of Knoxville, a municipal corporation of the same State, and against certain indi-

vidual citizens of Tennessee constituting the Waterworks Commission of that city.

Are the rights which the plaintiff sought to protect secured by the Constitution of the United States in any such sense as to make the case—the parties, all, being citizens of Tennessee—one arising under that instrument and therefore one of which the Circuit Court could take original cognizance? An answer to these questions, it would seem, requires for their intelligent solution a somewhat extended statement of the facts.

The Water Company, by its charter granted in 1877, was authorized to establish waterworks of sufficient capacity to furnish the corporate authorities and inhabitants of Knoxville with water. To that end it was empowered to lay down pipes through the streets, lanes and alleys of the city; bring into the city a sufficient supply of water by means of pipes or tanks, or in any other way; construct reservoirs; supply with water the inhabitants of the city and its environs and all who may be along the lines of the company's pipes; erect hydrants or fire plugs; and contract with the inhabitants and with the corporate authorities of the city or any incorporated companies for the use of water, charging such price for the same as might be agreed upon between the company and the parties.

Prior to 1882—taking the allegations of the bill to be true, since the case went off in the Circuit Court upon demurrer to the bill—the city of Knoxville determined to establish a system of waterworks, and to that end it purchased certain real estate. But that scheme having been abandoned or having been ascertained to be unwise and impracticable at that time, the city advertised for bids and proposals by responsible parties for the erection of waterworks, which, after being built, it was to have the option of purchasing at a time to be agreed upon.

The advertisement brought two competitive propositions, one by the City Water Company and the other by the present plaintiff. The proposition of the plaintiff was accepted, and thereupon the city and the plaintiff on the first day of July,

1882, entered into an agreement or contract which is the foundation of this suit.

By that agreement the Water Company stipulated (omitting many minor details): That it would erect and establish on the land acquired by the city a system of waterworks, with reservoir and all necessary mains, pipes, hydrants, machinery, buildings and other appurtenances and incidents sufficient to supply the city with water to be taken from the Tennessee River at the site purchased by the city for that purpose—the waterworks and fixtures throughout to be of first-class materials, capable of furnishing 2,000,000 gallons of water every twenty-four hours and affording an uninterrupted daily supply to the city of such quantity as might be required, not exceeding the amount above specified, and the reservoir to be built on a specified site, and to have a capacity of 3,200,000 gallons of water. The company was to furnish water free of charge (except the rental of hydrants) from hydrants for the sprinkling of streets and flushing of gutters and sewers along, on or under such streets as were curbed, guttered or sewered; also, free of charge, water for all purposes of the fire department and for supplying the city hall buildings, office and prison. It was to purchase at the price of $7,800 the property then already acquired by the city for the purpose of erecting waterworks, including lands, plans, specifications, drawings, maps, etc., and to pay therefor within thirty days from the execution of the agreement and before the construction of said works. It engaged to supply private consumers with water at a rate not to exceed five cents per hundred gallons, the cost of introducing from the mains, and the cost of meter when used, to be borne by such private parties. The work of construction was to be commenced within thirty days from the execution of the agreement, and the works to be completed, ready for use, within twelve months thereafter. The company was to maintain the waterworks stipulated to be built by it in such condition as would enable it to comply with its undertakings for the period of thirty years from January 1, 1883, unless the city should become the owner of the same

within that period.  At its own expense it was to establish
with the waterworks a system of telegraphic fire alarms of such
quality and efficiency as those in general use in cities, consist-
ing of two alarm boxes in each of the (then) eight wards
of the city, with proper telegraphic connections with a central
station.

In consideration of the promises and undertakings by the
Water Company, as set out in the above agreement, the city
covenanted and agreed, among other things, "not to grant to
any other person or corporation, any contract or privilege to
furnish water to the city of Knoxville, or the privilege of erect-
ing upon the public streets, lanes, or alleys or other public
grounds for the purpose of furnishing said city or the inhabi-
tants thereof with water for the full period of thirty years from
the first day of August, A. D. 1883, provided the company com-
ply with the requirements and obligations imposed and assumed
by them under and by virtue of this agreement;" also, "to
pay to said company for rent of the seventy-five hydrants here-
inbefore stipulated to be erected fifty dollars each per annum,
payable in quarterly instalments on the last day of each quarter,
beginning on the day upon which the city shall commence re-
ceiving a supply of water from said works, and for any addi-
tional hydrants erected for the use of the city it will pay in the
same manner at the rate of not more than fifty dollars each per
annum. . . ."  Recognizing the benefit and advantage ac-
cruing to it and to its citizens from the construction of the
waterworks and the erection of hydrants, the city also cove-
nanted and agreed with the Water Company "to pay, in addi-
tion to the annual rent of fifty dollars, as hereinbefore provided,
and as an additional annual rent for the said seventy-five hy-
drants, a sum equal to that which, under the laws of the State
and the ordinances and resolutions of the city, would be annu-
ally assessed as taxes for city purposes and uses on property of
the same kind, quantity and value as that owned by the said
Water Company within the corporate limits of the city of Knox-
ville: Provided, that the said additional annual rental shall only

be paid for the term of five years next following first of August, 1894, and no longer."

It was further mutually agreed and understood between the parties that at the expiration of fifteen years from the time fixed for the completion of the waterworks the city should have the right, upon giving one year's notice of such purpose and intention, to purchase from the company the waterworks provided for, and all the property, rights, franchises and privileges thereto belonging; by negotiations, if the terms could in that way be agreed upon, or if not then at any time for a consideration to be fixed and determined by appraisers; and if not purchased at the end of fifteen years, the waterworks plant, franchises, rights, privileges, etc., could be purchased by the city upon the same terms and conditions and in the same way at the expiration of each and every year thereafter. But in no case was such right of purchase to exist or be exercised unless due notice thereof was given one year before the expiration of the period aforesaid or either of them. If the parties differed as to price, the matter, the agreement provided, was to be determined by appraisers designated in a particular way, and whose award should be final and conclusive. It was further stipulated that the Water Company should not transfer, set over or assign the agreement for the construction of the waterworks to any company, corporation or individual whatsoever.

By an ordinance adopted October 20, 1899, the city consented to the consolidation of the Knoxville Water Company and the Lonsdale-Beaumont Water Company, and made certain changes both in the contract between the latter company and the town of West Knoxville and in the above agreement of 1882. It is not necessary to set out these changes.

We come now to the act of the Tennessee Legislature of February 2, 1903, passed avowedly for the purpose of enabling the city to exercise the option it had under the agreement of 1882 and the ordinance of 1899 to purchase and acquire the plant and property of the Water Company and maintain it for the benefit of its people. To that end the act authorized the city

to issue bonds to an amount sufficient for that purpose, upon the agreed valuation of the parties, or in default of same, upon a valuation to be ascertained and fixed by appraisers, and to such additional amount as would be necessary in making additions to the plant, including real estate required for such additions. It was, however, provided that bonds should not be issued unless approved by the assent of two-thirds of the qualified voters of the city, expressed at an election duly held to ascertain their wishes. The execution of the provisions of the act was committed to a Waterworks Commission, to be created by the City Council, and to have the power to make all contracts for the maintenance and extension of the plant.

Subsequently, the Legislature passed the act of April 3, 1903 (also amending the above act of February 2, 1903), whereby the city was authorized to acquire, own and operate a system of waterworks, either by purchase or construction, and for that purpose power was given to issue interest-bearing coupon bonds to an amount not exceeding $750,000 under the restrictions named in the act. The act created a Waterworks Commission of five members, to be elected by the City Council, and to have the entire supervision, under prescribed restrictions, of the purchase or construction, operation and maintenance of any system of waterworks established under the sanction of the act. The act embodied, among others, a provision authorizing and directing the Commissioners to obtain from the Water Company a written proposition for the sale of its plant, franchises, etc., to the city of Knoxville, giving the price and terms of payment, together with the opinion of competent, disinterested experts as to the cost and present value of the plant; the commission to secure plans, specifications and estimates of the cost of the construction of a new system of waterworks, and to report all matters to the City Council for its consideration, but not to close any contract for the purchase or construction of waterworks until it had been duly authorized to do so by the City Council after the proposition shall have been ratified by a vote of the people.

If the city determined to construct, equip and maintain its own system of waterworks, then for the purpose of securing sites for pumping stations and other necessary purposes, including the laying of mains and water pipes and sites for reservoirs and filtering galleries, extensions, improvements and alterations, it was given the right of condemnation of grounds within and without its corporate limits.

There is no need to refer to other provisions of the agreement of 1882. But it may be said in this connection that an election was held on the second day of July, 1903; and the City Council—having express authority to declare the result of the election—declared, by ordinance, that 1,818 votes had been cast in favor of, and only 239 votes against, an issue of bonds for the construction by the city of a system of waterworks. It may be also stated, in this connection, that after the passage of the two acts of 1903, and before the above election, some correspondence ensued between the Water Commission and the Water Company in reference to the purchase of the latter's plant. But the parties failed to agree as to the mode of ascertaining the value of the company's plant, and negotiations ceased. It is not important to inquire which side, if either, was to blame in this matter. Suffice it to say that the City Council, on or about May 20, 1904, conceived and was about to enter a plan of establishing a system of city waterworks wholly independent of, and in competition with, that maintained by the Water Company.

The present suit was brought upon the theory that the legislative enactments of 1903 were laws impairing the obligations of the contract of 1882 between the Water Company and the city, as well as upon the theory that the maintenance by the city of a system of waterworks in competition with those of the Water Company would inevitably destroy the value of the latter's property, and be a taking, under the sanction of the State, of the company's property for public use without compensation, in violation of the due process of law enjoined by the Fourteenth Amendment.

The substantial relief asked was a perpetual injunction restraining the city, its agents or officers, and the Waterworks Commission from entering into any contract for the construction of a separate, independent and competing plant, and from issuing any bonds for such a purpose. -

Upon the question of the jurisdiction of the Circuit Court to take cognizance of this case, without regard to the citizenship of the parties, but little need be said. The Water Company, as we have seen, insists that the agreement of 1882 constituted a contract, whereby it acquired, for a given period, an exclusive right, by means of pipes laid in the public ways and a system of works established for that purpose, to supply water for the use of the city and its inhabitants. It also insists, as just stated, that the obligation of this contract will be impaired if the city, proceeding under the acts of the Legislature and under the ordinances in question, establishes and maintains an independent, separate system of waterworks in competition with those of the Water Company. These questions having been aptly raised by the company's bill, the case is plainly one arising under the Constitution of the United States.

The fundamental question in the case is whether the city, by the agreement of 1882, or in any other way, has so tied its hands by contract that it cannot, consistently with the constitutional rights of the Water Company, establish and maintain a separate system of waterworks of its own. If the city made no such contract that will be an end of the case; for, in the absence of a contract protected by the Constitution of the United States, the Circuit Court could not take cognizance of the dispute between the parties, all citizens of Tennessee; and it could not be said that any taking of private property for public use could arise merely from the construction and maintenance by the city of a waterworks plant.

The principles which must control in determining the scope and obligations of the agreement of 1882 have been clearly outlined in our decisions. We may assume, for purposes of the present discussion, but without deciding, that the city of Knox-

ville was invested by the Legislature with full authority, or that under its general municipal powers it could bind itself by con-tract, to give to a single corporation or company the *exclusive* right for a specified period to supply water for the use of itself and its inhabitants.   It will yet be conceded that whatever authority it possessed in this matter was granted solely for the public good, and that in every substantial, legal sense the agreement with the Water Company is to be deemed a public grant, entitling that company to exercise certain public functions that appertain to the city as a municipal corporation.

Although the doctrines which must control in determining the scope of such a grant are clearly settled and are familiar, it may be well to recall the words of some of the adjudged cases. In *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 544, 547, 548, the doctrine announced was that government, possessing powers that affect the public interests, and having entered into a contract involving such interests, is not, by means merely of implications or presumptions, to be disarmed of powers necessary to accomplish the objects of its existence; that any ambiguity in the terms of such a contract " 'must operate against the adventurers and in favor of the public, and the plaintiffs can claim nothing that is not clearly given by the act;' " that "it can never be assumed that the Government intended to diminish its power of accomplishing the end for which it was created;" and that those who insist that the Government has surrendered any of its powers or agreed that they may be diminished, must find clear warrant for such a contention before it can be heeded.   "Grants of franchises and special privileges are always to be construed most strongly against the donee, and in favor of the public."   Such were the words of this court in *Turnpike Co.* v. *Illinois,* 96 U. S. 63, 68.   The universal rule in doubtful cases—this court said in *Oregon Railway Co.* v. *Oregonian Ry. Co.,* 130 U. S. 1, 26—is that "the construction shall be against the grantee and in favor of the Government."   As late as *Coosaw Mining Co.* v. *South Carolina,* 144 U. S. 550, 562, this court said: "The doctrine is firmly established that only

that which is granted in clear and explicit terms passes by a
grant of property, franchises or privileges in which the Govern-
ment or the public has an interest.[1] Statutory grants of that
character are to be construed strictly in favor of the public, and
whatever is not unequivocally granted is withheld; nothing
passes by mere implication.[2] This principle, it has been said,
is a wise one, as it serves to defeat any purpose concealed by
the skillful use of terms to accomplish something not apparent
on the face of the act, and thus sanctions only open dealing
with legislative bodies." *Slidell* v. *Grandjean*, 111 U. S. 412,
438. We have never departed from or modified these princi-
ples, but have reaffirmed them in many cases.[3]

It is true that the cases to which we have referred involved
in the main the construction of legislative enactments. But
the principles they announce apply with full force to ordinances
and contracts by municipal corporations in respect of matters
that concern the public. The authorities are all agreed that a
municipal corporation, when exerting its functions for the gen-
eral good, is not to be shorn of its powers by mere implication.
If by contract or otherwise it may, in particular circumstances,
restrict the exercise of its public powers, the intention to do so
must be manifested by words so clear as not to admit of two
different or inconsistent meanings.

Turning, now, to the agreement of 1882, we fail to find in it
any words necessarily importing an obligation on the part of
the city not to establish and maintain waterworks of its own
during the term of the Water Company. It is said that the

---

[1] Citing: *Rice* v. *Railroad Co.*, 1 Black, 358, 380; *Fertilizing Co.* v. *Hyde
Park*, 97 U. S. 659, 666; *Hannibal &c. R. R.* v. *Missouri Packet Co.*, 125 U. S.
260, 271; *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 24, 49;
*Stein* v. *Bienville Water Supply Co.*, 141 U. S. 67, 80; *State* v. *Pacific Guano
Co.*, 22 S. Car. 50, 83, 86.

[2] Citing: *Holyoke Co.* v. *Lyman*, 15 Wall. 500; *The Binghamton Bridge*, 3
Wall. 51, 75.

[3] *United States* v. *Arredondo*, 6 Pet. 691, 738; *Mills* v. *St. Clair County*, 8
How. 569, 581; *Richmond &c. R. R. Co.* v. *Louisa R. R. Co.*, 13 How. 71, 81;
*Dubuque & Pacific R. R. Co.* v. *Litchfield*, 23 How. 66, 88; *Newton* v. *Com-
missioners*, 100 U. S. 548, 561.

company could not possibly have believed that the city would establish waterworks to be operated in competition with its system, for such competition would be ruinous to the Water Company, as its projectors, on a moment's reflection, could have perceived when the agreement of 1882 was made. On the other hand, the city may with much reason say that, having once thought of having its own waterworks, the failure to insert in that agreement a provision precluding it, in all circumstances and during a long period, from having its own separate system, shows that it was not its purpose to so restrict the exercise of its powers, but to remain absolutely free to act as changed circumstances or the public exigencies might demand. The stipulation in the agreement that the city would not, at any time during the thirty years commencing August 1, 1883, grant to any person or corporation the same privileges it had given to the Water Company, was by no means an agreement that it would never, during that period, construct and maintain waterworks of its own. For some reason, not distinctly disclosed by the record, the city abandoned the scheme it had at one time formed of constructing its own system of waterworks. And it may be that it did not in 1882 intend or expect ever again to think favorably of such a scheme. It may also be that the Water Company, having knowledge of what the city had done or attempted prior to 1882, deliberately concluded to risk the possibility of municipal competition, if the city would agree not to give to other persons or corporations the same privileges it had given to that company. The city did so agree, and thereby bound itself by contract to the extent just stated, omitting, as if purposely, not to bind itself further. The agreement, as executed, is entirely consistent with the idea that while the city, at the time of making the agreement of 1882, had no purpose or plan to establish and operate its own waterworks in competition with those of the Water Company, it refrained from binding itself not to do so, although willing to stipulate, as it did stipulate, that the grant to the Water Company should be exclusive as against all other persons or corporations. We are therefore

constrained by the words of the agreement to hold that the city did not assume, by any contract protected by the Constitution of the United States, to restrict its right to have a system of waterworks, independent altogether of the system established and maintained by the Water Company. If this interpretation of the contract will bring hardship and loss to the Water Company, and to those having an interest in its property and bonds, the result (omitting now any consideration of the question of power) is due to the absence from the agreement between the parties of any stipulation binding the city not to do what, unless restrained, it now proposes to do.

While there is no case precisely like the present one in all its facts, the adjudged cases lead to no other conclusion than the one just indicated. We may well repeat here what was said in a somewhat similar case, where a municipal corporation established gas works of its own in competition with a private gas company which under previous authority had placed its pipes, mains, etc., in public streets to supply, and was supplying, gas for a city and its inhabitants: "It may be that the stockholders of the plaintiff supposed, at the time it became incorporated, and when they made their original investment, that the city would never do what evidently is contemplated by the ordinance of 1889. And it may be that the erection and maintenance of gas works by the city at the public expense, and in competition with the plaintiff, will ultimately impair, if not destroy, the value of the plaintiff's works for the purposes for which they were established. But such considerations cannot control the determination of the legal rights of parties. As said by this court in *Curtis* v *Whitney*, 13 Wall. 68, 70: 'Nor does every statute which affects the value of a contract impair its obligation. It is one of the contingencies to which parties look now in making a large class of contracts, that they may be affected in many ways by state and National legislation.' If parties wish to guard against contingencies of that kind they must do so by such clear and explicit language as will take their contracts out of the established rule that public grants,

susceptible of two constructions, must receive the one most favorable to the public.'' *Hamilton Gaslight Co.* v. *Hamilton City*, 146 U. S. 258, 268; *Skaneateles Water Co.* v. *Skaneateles*, 184 U. S. 354, 363.

So in *Joplin* v. *Light Co.*, 191 U. S. 150, 156, which involved the question whether a city could establish its own electric plant in competition with that of a private corporation, the court said: ''The limitation contended for is upon a governmental agency, and restraints upon that must not be readily implied. The appellee concedes, as we have seen, that it has no exclusive right, and yet contends for a limitation upon the city which might give it (the appellee) a practical monopoly. Others may not seek to compete with it, and if the city cannot, the city is left with a useless potentiality while the appellee exercises and enjoys a practically exclusive right. There are presumptions, we repeat, against the granting of exclusive rights and against limitations upon the powers of government.''

Again, in the recent case of *Helena Water Works Company* v. *Helena*, 195 U. S. 383, 392, where a city established its own system of waterworks in competition with that of a private company, the court, observing that the city had not specifically bound itself not to construct its own plant, said: ''Had it been intended to exclude the city from exercising the privilege of establishing its own plant, such purpose could have been expressed by apt words, as was the case in *Walla Walla City* v. *Walla Walla Water Company*, 172 U. S. 1. It is doubtless true that the erection of such a plant by the city will render the property of the water company less valuable and, perhaps, unprofitable, but if it was intended to prevent such competition, a right to do so should not have been left to argument or implication, but made certain by the terms of the contract.'' To the same effect, as to the principle involved, are *Turnpike Co.* v. *State*, 3 Wall. 210, 213; *Stein* v. *Bienville Water Supply Co.*, 141 U. S. 67, 81; *Long Island Water Supply Co.* v. *Brooklyn*, 166 U. S. 685.

It is, we think, important that the courts should adhere firmly

to the salutary doctrine underlying the whole law of municipal corporations and the doctrines of the adjudged cases, that grants of special privileges affecting the general interests are to be liberally construed in favor of the public, and that no public body, charged with public duties, be held upon mere implication or presumption to have divested itself of its powers.

As, then, the city of Knoxville cannot be held to have precluded itself by contract from establishing its own independent system of waterworks, it becomes unnecessary to consider any other question in the case. The judgment of the court dismissing the bill must be affirmed.

*It is so ordered.*

·Mr. Justice Brown, Mr. Justice White, Mr. Justice Peckham and Mr. Justice Holmes dissented.