MUSKEGON TRACTION & LIGHTING CO. *v.* CITY OF MUSKEGON.

1. MUNICIPAL CORPORATIONS—SINKING FUND — CHARTERS — STATUTES—MUSKEGON CHARTER.
   Act No. 344, Local Acts 1901, authorizing the city of Muskegon to establish an electric lighting plant and to create a sinking fund to provide for the bonds, does not require the creation of the fund in advance of the election authorizing the bond issue: the plant was not established, within the intent of the statute until the council, after all preliminary steps had been taken, provided for the issuance and sale of the bonds.

2. SAME—WORDS AND PHRASES—DEFINITION.
   To establish means to originate and secure the permanent existence of; to create and regulate; to make stable and firm.

3. SAME—BONDS—PROVISIONS FOR FUND.
   In providing that the full amount of the bond issue should be

paid into the sinking fund in yearly installments, without making an allowance for accumulated interest earned by the moneys so paid in, the council did not exceed its authority: since it could not be assumed that the money would earn four per cent. continuously; nor should it be presumed that after the fund became sufficient to liquidate the indebtedness further installments would be paid in.

4. SAME—CONSTRUCTION OF CHARTER.

The provisions of the city charter requiring the council to determine the amounts to be paid into the sinking fund from. the revenues of the plant and from the contingent fund of the city mean that the council shall, from time to time, fix the several sums to be taken from each source.

5. CONSTITUTIONAL LAW—DEPRIVATION OF PROPERTY—CHARTERS—CORPORATIONS.

The action of the city of Muskegon in establishing a municipal lighting plant was valid, and the provisions of its charter, authorizing the same, were constitutional and did not unlawfully deprive of its property rights a complainant power and lighting corporation which had an unexpired charter and franchise to use the streets, alleys, and public places for a number of years.

6. MUNICIPAL CORPORATIONS—FRANCHISES—MONOPOLIES.

Complainant's franchise did not create a monopoly, or an exclusive right to occupy the streets.

Appeal from Muskegon; Sessions, J. Submitted June 22, 1911. (Docket No. 74.) Reargued October 13, 1911. Decided November 3, 1911.

Bill by the Muskegon Traction & Lighting Company against the city of Muskegon and the mayor and members of the common council thereof, and others, to enjoin the establishment of a municipal lighting plant. From a decree dismissing the bill, complainant appeals. Affirmed.

*Cross, Vanderwerp, Foote & Ross* (*F. A. Nims* and *Willard Kingsley*, of counsel), for complainant.

*John A. McLaughlin* (*James E. Sullivan*, of counsel), for defendants.

The bill of complaint is filed in this cause for the purpose of enjoining the city of Muskegon and its officers

from issuing bonds of said city in the sum of $75,000 for the construction of an electric lighting plant for the purpose of supplying the city of Muskegon and the inhabitants thereof with proper lights for municipal, domestic, and other purposes, and from selling, or attempting to sell, such bonds; also to have declared void all of the proceedings taken by the council of said city in the matter of said municipal electric lighting plant, including said proposed issue of bonds. At the time the defendant city took the proceedings which are questioned, the complainant, a Michigan corporation, had a contract with it for municipal lighting, which by its terms would expire June 1, 1911. While this contract between complainant and defendant city was in force, the charter of the city of Muskegon was amended by Act No. 344, Local Acts 1901. Section 42 of title 7 of the charter is as follows:

"It shall be lawful for the city of Muskegon to purchase, or to construct and to operate and maintain an electric or other lighting plant, for the purpose of supplying the city and the inhabitants thereof with proper lights, for municipal, domestic and other purposes. It may borrow on the faith of the city not to exceed seventy-five thousand dollars and issue its bonds therefor, to be used for such purposes and for no other purposes. No limitation in this act contained as to the amount of the bonded indebtedness of said city shall apply to bonds which may be issued under the provisions of this section. Such bonds shall be signed by the mayor and countersigned by the recorder, and issued in such denominations as the council shall direct. They shall run for a period not exceeding twenty years and shall bear interest at a rate not to exceed four per cent. per annum, and shall be sold under the direction of the council for not less than par value: *Provided*, that nothing in this section contained shall be construed to authorize the incurring of any bonded indebtedness on the part of the city unless the qualified electors of said city voting on such question at any regular election, or special election called for such purpose, shall have authorized the incurring of the same by a majority of their votes cast upon such question. *Provided further*, that in case such a plant shall be established there shall, at the time of the establishing thereof, be

created a sinking fund for the purpose of paying the principal of the bonded debt for the purpose of constructing such plant; and from the revenue received from the users of such lights a certain fixed amount, to be determined by the council, shall be paid into such sinking fund at regular stated periods to be fixed by the council. And there shall also be paid into such sinking fund, annually, from the contingent fund of said city, a certain amount to be determined by the council. Such sinking fund shall be kept inviolate and be used for the payment of the principal of said bonded debt and for no other purpose."

The defendant city took the following proceedings under the foregoing statute:

(1) On March 7, 1910, the council passed a resolution reciting that the council deemed it for the best interest and welfare of the city that it should construct, operate, and maintain an electric lighting plant for the purpose of supplying the city and its inhabitants with proper lights for municipal, domestic, and commercial purposes, and resolving that the council deemed it necessary to issue bonds of the city in the amount of $75,000 for the purpose of constructing said plant; the bonds to be of the denomination of $1,000 each, to draw interest at 4 per cent. per annum, payable January 1st of each year, the bonds themselves to become payable $15,000 on the 1st day of January of each year from 1926 to 1930, inclusive, and to be sold under the direction of the council for not less than par. The resolution further provided for an election to be held on April 4, 1910, to authorize the issuance of said bonds.

(2) The election was held on April 4, 1910, and the issuance of said bonds was authorized by a large majority.

(3) On April 7, 1910, the returns of the votes on the bonding proposition were duly canvassed, and it was determined that said proposition had been duly carried.

(4) On August 15, 1910, the city council adopted the following resolution:

"Resolved, that the city of Muskegon shall construct, operate and maintain in said city an electric lighting plant

for the purpose of supplying said city and the inhabitants thereof with proper lights for municipal, domestic, and other purposes; and that proper proceedings be taken to secure the sum of $75,000 to be used for the purpose of establishing said plant by the issue of the bonds of the city of Muskegon. It is further resolved, that there shall be and there is hereby created a lighting plant sinking fund for the purpose of paying the principal of the bonded indebtedness hereinbefore mentioned; that from the revenue received from the users of such lights and from the contingent fund of said city, there shall be paid into said sinking fund not less than $4,000 annually from the 1st day of January, 1911, to the 1st day of January, 1929, and the sum of $3,000 on the 1st day of January, 1930; that such sinking fund shall be kept inviolate, and be used for the payment of the principal of the bonded indebtedness hereinbefore mentioned and for no other purpose."

(5) On the same day the council passed another resolution, which, after reciting all the steps taken, provided for the issuance of the bonds, their number, date, and method of payment, rate of interest, method of sale, and form of bond.

(6) On October 17, 1910, the city council adopted a resolution authorizing the mayor to have the bonds printed and to enter into negotiations with brokers with a view to selling the bonds at par. When the defendant city had proceeded thus far with its enterprise, and on October 25, 1910, complainant filed its bill of complaint, and secured an injunction temporarily restraining further action. Upon a full hearing a few days later, a decree was entered dismissing the bill of complaint.

From this decree complainant appeals.

BROOKE, J. (*after stating the facts*). Appellant states the vital questions presented as follows:

"(1) The character and validity of the so-called lighting plant sinking fund attempted to be created by the council of said city.

"(2) Whether the above-quoted section 42 of title 7 of the charter of said city is null and void as against the rights and franchises of complainant, in that said section

is in violation of section 1 of article 14 of the Constitution
of the United States, for the reason that at the time of the
granting of the aforesaid franchises now owned by com-
plainant, and in reliance upon which it has made large
expenditures, there was no authority of law and no pro-
vision in the then charter of said city of Muskegon author-
izing it to purchase, or to construct and to operate and
maintain an electric or other lighting plant, for the pur-
pose of supplying the city and the inhabitants thereof
with proper lights, for municipal, domestic, and other
purposes, and such right cannot be lawfully conferred
upon said city so long as the franchises of complainant
remain in force."

Under the first subdivision we understand complain-
ant's position to be that the action of defendant in creat-
ing or attempting to create a sinking fund should be held
to be nugatory for three different reasons:

*First.* Because the action of the council in creating the
sinking fund was not taken seasonably. The statute pro-
vides:

"That in case such plant shall be established, there
shall, at the time of the establishing thereof, be created a
sinking fund," etc.

Complainant urges that:

"The entire scheme of the council for the establishment
of a municipal lighting plant, including the creation of a
sinking fund and the proposed issue of bonds, should have
been submitted to the qualified electors of said city for
their ratification or rejection."

We search the charter in vain to find language requir-
ing the sinking fund to be created in advance of the elec-
tion. It cannot be said, as contended by counsel for com-
plainant, that the plant was established by the affirmative
vote of the people upon the bonding proposition alone,
that was one of the necessary statutory steps in the pro-
ceeding, but we think it clear that the plant was not es-
tablished in any legal sense until August 15, 1910, upon
which date the council, after reciting the preliminary
steps, definitely authorized the issuance of the bonds, and

provided for the sale thereof. Upon the same day the resolution creating the sinking fund was passed. This was, in our opinion, the earliest moment at which this action could legally have been taken. The electors, in voting upon the proposition, could not have been misled, for the resolution of March 7, 1910, providing for the election, fully advised them of every fact material to the issue. No reason, therefore, exists for holding that the action of the council in providing for the sinking fund was taken too late. It might, indeed, be urged that the action was taken too early, upon the theory that in using the words, "at the time of the establishing thereof," the legislature had reference rather to the physical act of creation than to the legal step necessarily preliminary thereto. "To establish" means "to originate and secure the permanent existence of; to found; to institute; to create and regulate; to make stable and firm." We are of opinion that the legislature used the word "establish" in this statute to characterize a legal, rather than a physical, act. The case of *Ketchum* v. *City of Buffalo*, 14 N. Y. 356, cited and relied upon by complainant, has been examined, but it does not, in our opinion, militate against our present holding.

*Second.* It is next urged that, in providing for the payment into the fund of the full amount of $75,000, the council has acted illegally, in that it has ignored the earning power of the money in the fund from time to time. Complainant shows that if the payments are made into the fund, as provided by the resolution creating it, and the money is kept invested at 4 per cent. per annum compounded until the last bond is paid, there will remain in the fund after such payment the sum of $32,707.33. It is therefore claimed by complainant that the council acted unlawfully in calling upon the taxpayers to raise that sum in excess of the amount needed to retire the bonds at maturity. This contention assumes that two things will occur, neither one of which is likely to happen. In the

first place, it assumes that the custodians of the sinking fund will be able to invest the money at 4 per cent. This, it seems to us, is an assumption wholly unwarranted. The first consideration involved in the care of such a fund is the absolute security of the principal. While the earning capacity of the fund should not be ignored (*Commissioners* v. *Walker,* 6 How. [Miss.] 143 [38 Am. Dec. 433]; *Sinking Fund Cases,* 99 U. S. 725), it can only be realized upon under such limitations as eliminate entirely the element of speculation. This necessarily involves investment in securities bearing a low rate of interest, and it is conceivable that during a portion of the time, perhaps even during all the time, such might not be available. Again, it assumed that payments will be made into the fund after it has reached a sum adequate for the retirement of all the bonds. We can scarcely conceive of such a course being taken. The law provides:

"Such sinking fund shall be kept inviolate and used for the payment of the principal of said bonded debt and for no other purpose."

It is not to be supposed that the city, through its responsible officers, would continue to tax itself for money to put into a fund already sufficient to meet the purpose of its creation, and particularly is this true when we consider that the excess fund so created cannot be devoted to any other purpose.

*Third.* The use of the words "not less" occurring in the resolution creating the fund is criticised. It is urged that under this resolution payments may be made into the fund largely in excess of $4,000 per annum, the sum named in the resolution. What we have said in answer to the second objection is pertinent here. Counsel for complainant neglect to point out any possible reason, and we are able to apprehend [none, why the defendant city should tax itself to create a fund largely in excess of any demands which can be made upon it, when the law distinctly points out the only use to which the fund may be devoted.

Again, it is claimed that, in providing for the sinking fund, this resolution should have determined a "certain fixed amount" to be taken from the revenue received from the users of such lights, and a "certain amount" to be paid from the contingent fund of the city. Instead of doing this, the resolution provides for the payment of not less than $4,000 annually into the fund from both sources. We must assume that the legislature did not intend to require an impossible thing to be done. In advance of the installation and actual operation of the plant, the council can have no information as to the number of users of the lights or the approximate revenue to be derived therefrom. It must be borne in mind that complainant now has in operation a completely equipped and extensive plant which is giving service to the individual consumers as well as to the city. How many of these will patronize the municipal plant in preference to that of complainant can be known only by experience. Aside from these considerations, we are of opinion that the charter itself does not bear the construction contended for by complainant. It evidently means that, with the necessary information in hand, the council shall, from time to time, fix the several sums to be taken from each source.

We now come to the consideration of the claim of the complainant that the charter provision under consideration is unconstitutional and void, and against the vested rights of the complainant. This claim was not urged in the court below, and was not there passed upon. It is, however, fully urged here. It seems to be the contention of complainant that, because the ordinance permitting it to use the streets, alleys, and public places in the defendant city under certain restrictions, was approved May 8, 1900, and has still nearly 19 years to run, therefore the city is precluded from undertaking the erection of a municipal plant which will become a competitor with complainant for business. To agree with this position would be to hold that, in passing the ordinance in question, the defendant city had placed itself in the hands of a monopoly for

the period during which the ordinance is operative. We cannot so hold. It would, we think, scarcely be contended that the city might not license another competing company to use its streets, etc., for the purpose of furnishing a necessity to the inhabitants thereof. *Detroit, etc., R. Co.* v. *Railway,* 171 U. S. 48 (18 Sup. Ct. 732); *City of Joplin* v. *Light Co.,* 191 U. S. 150 (24 Sup. Ct. 43); *Knoxville Water Co.* v. *Knoxville,* 200 U. S. 22 (26 Sup. Ct. 224). If it may do this, why may it not itself engage in such competition? Sections 23 and 24 of article 8 of the Constitution of 1909 clearly clothe cities and villages with the necessary authority to engage in such enterprises under the restrictions there imposed. But it is said by complainant:

" It does not appear to be seemly that there should exist a condition of affairs which is certain to bring about competition between the city and private parties, bringing loss to all concerned, without profit or advantage to the city or anybody else."

The "certainty of loss to all concerned" apprehended by complainant rests solely upon supposition. There is no evidence to support the prediction. But, even if it were conclusively proven that this undertaking would result in loss to the city as well as to complainant, the courts would be powerless to restrain the city from its proposed course. Its power is complete and undoubted, its electors are dealing with their own money, and, if they choose to invest it in losing enterprises, so long as they comply with the law, it is their own concern. See *Hamilton Gaslight & Coke Co.* v. *City of Hamilton,* 146 U. S. 258 (13 Sup. Ct. 90); *Knoxville Water Co.* v. *Knoxville, supra.* We are of opinion that the learned circuit judge reached a proper conclusion.

The judgment is affirmed.

OSTRANDER, C. J., and BIRD, STEERE, MOORE, MCALVAY, BLAIR, and STONE, JJ., concurred.