**STATE OF OKLAHOMA ex rel. KING, Atty. Gen., v. HANDY.**

**No. 978.**

Circuit Court of Appeals, Tenth Circuit.

June 18, 1934.

Rehearing Denied Aug. 27, 1934.

Malcolm E. Rosser, of Muskogee, Okl., for appellant.

Joseph W. Bailey, Jr., of Dallas, Tex., for appellee.

Before PHILLIPS and BRATTON, Circuit Judges, and KENNEDY, District Judge.

BRATTON, Circuit Judge.

In 1876 the Chickasaw Tribe of Indians, hereinafter called the Chickasaw Nation, duly passed a legislative act granting to B. F. Colbert, his heirs and assigns, the right or franchise to construct and operate a toll-bridge across Red river at or near a place called Colbert's Ferry, and to charge and collect specified rates of toll for passage of persons and property across the river, either

on such bridge or otherwise within two and one-half miles up or the same distance down the stream from that point. It was provided therein that the franchise should be exclusive against any and all corporations, companies, and persons building another tollbridge, a ferry, or other conveyance across the river within the specified distance. The material parts of the grant are as follows:

"Section 1. Be it enacted by the Legislature of the Chickasaw Nation, That B. F. Colbert be and he is hereby authorized to build and keep up a toll bridge across the Red River, at his present ferry, if practicable, or at such a practicable point as he may select; Provided, However, that the place of building of the said bridge shall not exceed three miles in length from his ferry, up or down the said river, which is situated at his residence, on the Fort Smith road to Sherman, Texas, and about ten miles below the mouth of the river Washita, in the Chickasaw Nation; and the said toll bridge shall be for the accommodation and convenience of all classes of travelers and their property * * *.

"Sec. 2. Be it further enacted, That the said B. F. Colbert, his heirs and assigns, shall have the right to exclude any and all corporations, companies and persons from building any toll bridge within two and one-half miles of the said bridge; and also to exclude all persons, corporations and companies from establishing any kind of ferry or conveyance across the said river during the existence of said toll bridge within the limits specified in this section; and furthermore, he shall have the right to collect toll rates from all persons crossing the river other ways than by his bridge, just the same as if they had crossed on the bridge, if such crossings be within the limits of the said two and one-half miles specified above."

Red River Bridge Company, a corporation organized under the laws of the state of Texas, was formed for the purpose of constructing and operating the bridge thus authorized. Colbert conveyed to the corporation his right, title, and interest in the franchise and other privileges relating to the crossing of the river by bridge, ferry, or otherwise. By the act approved May 15, 1886, Congress granted to the corporation permission to construct, acquire, own, and operate a tollbridge at or near the mentioned site; the grant being subject to certain conditions not material here. 24 Stat. 28. Upon the faith of such franchise, grant, and conveyance, the corporation constructed a bridge across the river at the Colbert site with approaches and other equipment appurtenant thereto. That was done in 1890. The bridge was destroyed by flood in 1908 and it was rebuilt in 1915. A ferry was operated at the site during the interim.

The states of Oklahoma and Texas determined to construct a free bridge across the river within less than two and a half miles of the tollbridge as a part of a federal-aid interstate highway. A tract of land embracing 2.96 acres owned by the Bridge Company was needed as the approach thereto on the Oklahoma side. The state, upon relation of its Attorney General, instituted this action in condemnation in the district court of Bryan county, within that state, to acquire the land for that purpose. Eugenia Rhea was the original defendant. Marshall Rayney and the Bridge Company were subsequently joined as parties defendant. Commissioners, duly appointed for that purpose, appraised the land in question at $88 and submitted their report accordingly. The Bridge Company was placed in receivership. The receiver filed a written demand for jury trial. The case was then removed to the District Court of the United States for the Eastern District of Oklahoma. The receiver thereafter answered alleging that the franchise was issued; that the bridge was constructed, rebuilt, repaired, and maintained upon the faith of it; that it served adequately persons and property moving or desiring to move across the river; that it was a part of a highway leading from St. Louis, Mo., Muskogee, Okl., and other centers of commerce to and through Dennison, Sherman, Dallas, and other centers of commerce in Texas; that the value of the physical property depended entirely upon its continued use as a bridge; that as then being used, it was reasonably worth $350,000; that the construction and operation of the free bridge rendered it worthless. Damages were sought in the sum of $350,000.

The state interposed a demurrer to the answer. It was overruled. In the reply subsequently filed it was averred, among other things, that the franchise granted to Colbert and his heirs and assigns was not exclusive against the right of the Chickasaw Nation or the state of Oklahoma to build and maintain a free bridge within the described zone.

The court submitted to the jury only the question of values. They were directed to find the separate value of the land actually taken, that of the tollbridge structure, and

that of the franchise. They found such values to be $1,000, $67,000, and $100,000, respectively, aggregating $168,000. The values thus fixed are not challenged. On the contrary, they are conceded to be conservative in amount. Judgment was rendered accordingly, and an appeal seasonably perfected brought the case here on review. Several questions are presented for our consideration, but we think one of them is decisive.

We assume for the purpose of this case, without so deciding, that the Chickasaw Nation had authority to grant an exclusive franchise for the construction and maintenance of a bridge across the river. Roff v. Burney, 168 U. S. 218, 18 S. Ct. 60, 42 L. Ed. 442; Buster v. Wright (C. C. A.) 135 F. 947. The franchise in question expressly provides that Colbert and his heirs and assigns shall have the right to exclude any and all corporations, companies, and persons from constructing and operating another tollbridge, ferry, or conveyance across the river at a point within two and a half miles of the authorized bridge at any time during its existence. It will be observed that the language of exclusion is limited to corporations, companies, and persons. The Chickasaw Nation is not mentioned directly or indirectly. If the state, as successor in sovereignty, is limited in its right to construct and maintain a free bridge within the specified area or is rendered liable in damages for doing so, such limitation and resultant liability must be implied from the language contained in section 2, authorizing Colbert and his assigns to collect toll rates from all persons crossing the river otherwise than upon the tollbridge.

A grant in the nature of a franchise or special privilege must be strictly construed in favor of the public and against the donee; it is never extended by implication because it will not be presumed that the sovereign surrendered any part of its power. That which is not unequivocally granted is withheld. Nothing passes except by clear language to that effect. Charles River Bridge v. Warren Bridge, 11 Pet. 420, 547, 9 L. Ed. 773; Curtis v. Whitney, 13 Wall. (80 U. S.) 68, 20 L. Ed. 513; Barden v. Northern Pac. R. Co., 154 U. S. 288, 325, 14 S. Ct. 1030, 38 L. Ed. 992; Helena Water Works Co. v. Helena, 195 U. S. 383, 25 S. Ct. 40, 49 L. Ed. 245; Vicksburg v. Vicksburg Waterworks Co., 202 U. S. 453, 469, 26 S. Ct. 660, 50 L. Ed. 1102, 6 Ann. Cas. 253; City of Mitchell v. Dakota Central Tel. Co., 246 U. S. 396, 38 S. Ct. 362, 62 L. Ed. 793;

Piedmont Power & Light Co. v. Graham, 253 U. S. 193, 40 S. Ct. 453, 64 L. Ed. 855; District of Columbia v. R. P. Andrews Paper Co., 256 U. S. 582, 41 S. Ct. 545, 65 L. Ed. 1103; Reichelderfer v. Quinn, 287 U. S. 315, 53 S. Ct. 177, 77 L. Ed. 331; City of Paragould v. Arkansas Utilities Co. (C. C. A. 8th) 70 F.(2d) 530; Copeland v. City of Waldport (Or.) 31 P.(2d) 670. And in harmony with that rule of construction, every doubt or ambiguity in such a franchise or privilege must be resolved in favor of the sovereign and against the donee. If it is susceptible of two interpretations, one extending and the other restricting the grant, the one most favorable to the state or municipality should be adopted. The Binghamton Bridge, 3 Wall. 51, 75, 18 L. Ed. 137; Slidell v. Grandjean, 111 U. S. 412, 437, 4 S. Ct. 475, 28 L. Ed. 321; Hamilton Gaslight & Coke Co. v. City of Hamilton, 146 U. S. 258, 269, 13 S. Ct. 90, 36 L. Ed. 963; Durham Public Service Co. v. City of Durham, 261 U. S. 149, 43 S. Ct. 290, 67 L. Ed. 580. Had it been intended, in granting the franchise, to exclude the sovereign from the privilege of constructing and operating a bridge, or to limit its prerogative with respect thereto, that purpose could have been expressed in apt language. Failure to employ language to that effect forces the conclusion that such intent did not attend the granting of the franchise. Helena Water Works v. Helena, supra. Such language was incorporated in the grant brought under review in the case of Walla Walla City v. Walla Walla Water Co., 172 U. S. 1, 19 S. Ct. 77, 43 L. Ed. 341, and it was given force and effect. But it is absent here, and that is significant. The case of Knoxville Water Co. v. Knoxville, 200 U. S. 22, 26 S. Ct. 224, 228, 50 L. Ed. 353, is quite similar in point of fact and charts our course. It furnishes the mandate for the application of the foregoing principles in a case of this kind. There the city entered into a contract with the Water Company in which the company agreed to erect and maintain a system of waterworks for the city and its inhabitants and the city bound itself not to grant to any other person or corporation a contract or privilege to furnish water within the city for a period of thirty years. During that time the city determined to construct, equip, and operate its own system of waterworks. The issuance of bonds for that purpose was authorized in conformity with law. The Water Company instituted the suit to restrain the city from proceeding further, contending that the legislation authorizing

the city to construct and operate its system impaired the obligations of the contract previously entered into and that the maintenance of the system by the city in competition with that of the company would destroy the value of the latter's property and would result in taking it for public use without compensation in violation of the due process of law. The court held that the city merely obligated itself not to grant a similar contract to any person or corporation; that it did not bind itself to refrain from constructing and operating a waterworks system of its own. It was said:

"Turning, now, to the agreement of 1882, we fail to find in it any words necessarily importing an obligation on the part of the city not to establish and maintain waterworks of its own during the term of the water company. It is said that the company could not possibly have believed that the city would establish waterworks to be operated in competition with its system, for such competition would be ruinous to the water company, as its projectors, on a moment's reflection, could have perceived when the agreement of 1882 was made. On the other hand, the city may, with much reason, say that, having once thought of having its own waterworks, the failure to insert in that agreement a provision precluding it, in all circumstances, and during a long period, from having its own separate system, shows that it was not its purpose to so restrict the exercise of its powers, but to remain absolutely free to act as changed circumstances or the public exigencies might demand. The stipulation in the agreement that the city would not at any time during the thirty years commencing August 1, 1883, grant to any person or corporation the same privileges it had given to the water company, was by no means an agreement that it would never, during that period, construct and maintain waterworks of its own. For some reason, not distinctly disclosed by the record, the city abandoned the scheme it had at one time formed, of constructing its own system of waterworks. And it may be that it did not, in 1882, intend or expect ever again to think favorably of such a scheme. It may also be that the water company, having knowledge of what the city had done or attempted prior to 1882, deliberately concluded to risk the possibility of municipal competition, if the city would agree not to give to other persons or corporations the same privileges it had given to that company. The city did so agree, and thereby bound itself by contract to the extent just stated, omitting, as if purposely, not to bind itself further. The agreement, as executed, is entirely consistent with the idea that while the city, at the time of making the agreement of 1882, had no purpose or plan to establish and operate its own waterworks in competition with those of the water company, it refrained from binding itself not to do so, although willing to stipulate, as it did stipulate, that the grant to the water company should be exclusive as against all other persons or corporations. We are therefore constrained by the words of the agreement to hold that the city did not assume, by any contract protected by the Constitution of the United States, to restrict its right to have a system of waterworks independent altogether of the system established and maintained by the water company. If this interpretation of the contract will bring hardship and loss to the water company, and to those having an interest in its property and bonds, the result (omitting now any consideration of the question of power) is due to the absence from the agreement between the parties of any stipulation binding the city not to do what, unless restrained, it now proposes to do."

The doctrine thus enunciated and applied was reaffirmed in United Railroads v. San Francisco, 249 U. S. 517, 39 S. Ct. 361, 362, 63 L. Ed. 739. The court there said: "But however this may be neither that section nor section 5 of the order granting the franchise purports in terms to prevent the city from itself establishing a parallel road. If it be true, as the plaintiff argues, that the grant or contract in section 5 of the order means what the statute means and is to be construed by that, we have suggested what seems to us the natural construction of the act. But in any event it is decided by Knoxville Water Co. v. Knoxville, 200 U. S. 22, 26 S. Ct. 224, 50 L. Ed. 353, that a covenant by a city not to grant to any other person or corporation a privilege similar to that granted to the covenantee does not restrict the city from itself exercising similar power; and it is assumed in that case, that the principle already is established as to legislative grants."

In the Knoxville Case the city bound itself not to grant a similar right to "any other person or corporation." It was held that the obligation did not preclude the city from constructing and operating a water system of its own. Here the donee in the franchise is empowered to exclude all other "corporations, companies and persons" from constructing and maintaining a tollbridge, ferry, or other conveyance. The scope of the ex-

clusion is no broader here than there. It must not be extended by implication or inference. To do so would violate the governing rule of construction to which reference has been made. The sovereign, not being mentioned directly or indirectly, cannot be included by implication.

The case of Binghamton Bridge, 3 Wall. 51, 18 L. Ed. 137, upon which appellee strongly relies, is not in point. No question of the right of the state to maintain and operate a free bridge was involved. The state undertook to grant a franchise to a second private corporation to construct and operate a bridge in competition with the one then being operated under the first grant. It was held that the second grant fell within the exclusion of the first. A similar situation is not presented here. The differentiating features present themselves clearly and require no extended discussion.

[4, 5] Some emphasis is laid upon the language contained in the concluding part of section 2 of the franchise, giving the donee and his assigns the right to collect tolls from persons' crossing the river otherwise than by the authorized bridge. Since, for the reasons reviewed, the preceding words of exclusion do not limit the sovereign, it must be held that the subsequent language relates exclusively to private corporations, companies and persons as distinguished from the Chickasaw Nation or the state, because it is a cardinal principle of construction that all parts of an act should be construed together so that they will be given harmonious effect if that can be done without violating the clear legislative intent. That rule is so generally recognized that the citation of authorities to support it would be a work of supererogation. Accordingly, we think the entire section concerns itself with the rights of the donee and his assigns against private corporations and citizens, not the state.

■ Our attention is directed to the following provision of section 1 of the Schedule to the Constitution of the State of Oklahoma: "No existing rights, actions, suits, proceedings, contracts, or claims shall be affected by the change in the forms of government, but all shall continue as if no change in the forms of government had taken place."

That provision has no application here. It merely preserves existing rights. It does not create new ones. From what has been said, it is apparent that the exclusive nature of the franchise in question does not affect the right of the state to construct and operate a bridge within the described area.

■ One further contention remains to be weighed. It is asserted that, conceding the power of the state to construct and maintain the free bridge, by the exercise of that power the tollbridge and franchise appurtenant thereto were rendered valueless and that it amounted to the taking or destruction of private property for public use, for which the owner is entitled to just compensation. We have seen that in making the grant the sovereign did not surrender or limit its power—in whole or in part—to construct and maintain a bridge. Neither did the grant create an implied obligation that the grantor would refrain from doing any act which would affect the value of the tollbridge or the franchise. Skaneateles Waterworks Co. v. Skaneateles, 184 U. S. 354, 22 S. Ct. 400, 46 L. Ed. 585; Joplin v. Light Co., 191 U. S. 150. 24 S. Ct. 43, 48 L. Ed. 127; Helena Water Works Co. v. Helena, supra. The mere exercise of the prerogative to provide free transportation, without interference with the operation of the tollbridge or other impingement upon the use of the franchise, did not constitute the taking or destruction of private property for public use in the legal sense of a deprivation thereof with right of redress at law, although its value became less or the business rendered unprofitable. The risk of that eventuating result was assumed when the tollbridge was constructed under a franchise which did not forbid the state to maintain a free bridge. Hamilton Gaslight & Coke Co. v. City of Hamilton, supra; Skaneateles Water Co. v. Skaneateles, supra; United Railroads v. San Francisco, supra. Since the state did not exceed the bounds of its proprietary authority to furnish free transportation, it cannot be held liable for a diminution in the value of the tollbridge and franchise.

The judgment is reversed, and the cause remanded for further proceedings in harmony with the views herein expressed.

Reversed and remanded.