# HIGHFIELD WATER COMPANY *v.* PUBLIC SERVICE COMMISSION OF MARYLAND

[No. 1485, September Term, 1979.]

*Decided July 14, 1980.*

The cause was argued before MOYLAN and WILNER, JJ., and IRVING H. FISHER, Associate Judge of the District Court of Maryland for District 5, specially assigned.

*Richard N. Foltz, III,* for appellant.

*James A. Pine* and *Kirk J. Emge,* with whom was *Joel M. Bright* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

Appellant — Highfield Water Company (HWC) — formerly provided water service to about 300 families in a rural area of Washington County. On September 8, 1978, having previously conducted a public hearing in the matter, the Public Service Commission (PSC) issued Order No. 63332, in which it concluded that (1) HWC was not providing adequate service to its customers, (2) there was little likelihood that the company would be financially able to make the necessary improvements in order to provide adequate service, and (3) "it is consistent with the public convenience and necessity to have public ownership of the facilities necessary to provide water service to the Highfield area."

Upon these findings, the PSC revoked HWC's authority to exercise its franchise and requested the State Department of Health and Mental Hygiene (DHMH) and the Washington County Sanitary Commission (WCSC) to assume their respective responsibilities with respect to furnishing water service to the area. HWC appealed that order and now appeals the affirmance of it by the Circuit Court of Baltimore City. It complains (or asks) that:

> "I. The lower court erred in refusing to reinvestigate and reverse the findings of the

Public Service Commission. The actions of the Commission are clearly subject to review and must be reversed if it is found that the Commission acted in an improper manner.

II. The action of the Public Service Commission in issuing Order No. 63332 was improper due to the inadequate notice given to Highfield Water Company of the nature of the proceedings before the Commission.

III. Did the lower court err in failing to reverse the action of the Public Service Commission due to the Public Service Commission's failure to give preference to Highfield Water Company's rate case?

IV. The action of the Public Service Commission in revoking Highfield Water Company's right to exercise its franchise exceeded the statutory authority granted to it by *Md. Code* art. 78, § 24(a).

V. Did the lower court err in failing to find that the actions of the Public Service Commission constitute an unconstitutional taking of Highfield Water Company's property, because the procedure used was improper, because the Public Service Commission has no power to acquire property, and because there were means available for the proper taking of the property by authorized governmental agencies?"

A history of the proceedings that led to Order No. 63332 will facilitate our consideration of these issues.

HWC and a sister company that was incorporated in Pennsylvania jointly operated an integrated water system, supplying water in a service area that bordered the Mason-Dixon line. In 1974, the Pennsylvania company (and with it the Pennsylvania part of the integrated system) was purchased by the local public water authority and thus became lost to HWC as a steady resource. Thereafter, a

number of problems developed for HWC. Customers received rusty and malodorous water, at low pressures; every now and then, there was an outright cessation of water service, on one occasion lasting several weeks.

On June 29, 1977, HWC applied for an increase in rates, apparently to take effect July 31, 1977. Pursuant to its authority under Md. Ann. Code, art. 78, § 70 (b), the PSC suspended the increased tariff for 150 days (and then for an additional 30 days) pending a determination as to the justice and reasonableness of the increase. On January 17, 1978 — within the allowable 180-day period (dating from July 31, 1977) — PSC Order No. 62835 granting a part of the requested increase took effect.

While HWC's application for rate increase was pending, the PSC (and others) began to look into the adequacy of service provided by the company. On July 19, 1977, a public meeting was held in Cascade (within HWC's general service area) before the Washington County Commissioners. Present, among others, were a PSC Commissioner, PSC general counsel, a number of technical staff personnel from the Commission, and representatives of the Maryland Environmental Service. Based in whole or in part upon what was learned at that meeting, Joseph H. Walter, a PSC Public Service Engineer, wrote a memo to the Commission on August 10, 1977, in which he opined that the HWC water system "is not capable of providing service of acceptable standards to its present customers" and that, although the system storage was sufficient for existing customers, "the water distribution system needs improvement, specifically, replacement of smaller size mains and interconnecting various sections of main to provide more reliable service."

Upon receipt of the Walter memo, the Commission, on August 30, 1977, opened Case No. 7099 — "In the Matter of the Investigation by the Commission on its own Motion of the Adequacy of Water Service by Highfield Water Company" — with the issuance of Order No. 62553. In its preamble, this Order recited that (1) "[i]n response to several complaints concerning the water service provided by [HWC],

the Commission's Engineering Staff conducted an investigation of that Company's water system," (2) the Staff Engineer (Walter) had concluded that the system was not capable of providing service of acceptable standards and made certain specific recommendations as to system improvements, (3) under Md. Ann. Code art. 78, § 28 (c), HWC had an affirmative duty to furnish its customers with safe and adequate service, and (4) in view of the deficiencies noted by Walter, the Commission believed that HWC may not be providing its customers with adequate service. Upon that premise, the Order directed HWC to show cause, within 21 days, why it should not be directed to correct the system deficiencies described in the memo, a copy of which was attached to the Order.

A copy of the Order and memo was served on HWC. On September 20, 1977, counsel for the company requested that the time for answering the Order be extended until the PSC ruled on the company's request for rate increase. He said that HWC's financial data developed in connection with the rate case was prepared without knowledge of the "massive capital improvements" called for in the memo and did not "reflect any capital improvement costs." He stated further that, "[r]ecognizing the possible need for capital improvements," HWC had employed a consultant, whose report was attached to the letter. Counsel asked for time to "digest" the information in the report in order to "be in the position to outline *specific* capital improvements for review by the Commission."

The two-page report attached to counsel's letter was from John J. Mooney Associates. Its principal conclusions were as follows:

> "The Highfield system is presently an admixture of truncated growth, unplanned extensions and dependent supply. The system has been victimized by its satellite nature between two larger water facilities (Ft. Ritchie, Md. and Blue Ridge Summit [Pa.]).
>
> *No major rebuilding is possible in this limited*

*customer situation where revenues do not produce any borrowing power. Nevertheless, some improvements are essential.* I have therefore assessed priorities and present a phased program for your consideration as follows: . . . ." (Emphasis supplied.)

What followed then was a three-stage program of improvements involving the distribution system, well acquisitions, repairs to storage facilities, and meter testing and replacement. Mooney estimated the cost of Stage I at $70,000 but was unable, in that report, to estimate the cost of Stages II and III without "[e]xtensive additional study." [1]

PSC granted the requested extension, and a further extension sought on November 8, 1977. Finally, on December 15, 1977, HWC filed an answer to the show cause order. Most of the answer consists of a summary of the public hearing held on July 19, 1977, and the efforts being made by HWC to improve its system. The Company viewed the problem as involving supply and distribution, but not water quality. The supply problem, it suggested, had been resolved by an interconnection with the Government-operated Ft. Ritchie system, primarily serving the army base located there.[2] Distribution problems it proposed to solve by the staged improvement plan outlined by Mooney.

Among the points made in the answer were these five:

(1) "The cost of acquiring a new water source and replacing the distribution system will be in excess of $500,000.00."

(2) "The cost of these capital improvements will

---

1. In describing the Stage II improvements to the distribution system, Mooney noted, with respect to the line serving Royer and Ridge Road: "Royer Mt. Zion portion of 1700′ serves only 5 customers[.]" Despite complaints during extreme freeze conditions, replacement of 2″ line cannot be economically justified." The report did not suggest any other form of relief to these five customers, who apparently were without water during cold spells.

2. The Company neglected to mention that this was a temporary arrangement and that no contract for a permanent connection had been negotiated, much less executed.

ultimately be passed on to the consumer, irrespective of public or private ownership."

(3) "The geographic and demographic factors of the [HWC] customer service area economically prohibit an immediate total system replacement; the previously submitted and approved [3] 'phased' program is the only possible alternative."

(4) HWC "is unable to finance any other improvements [*i.e.*, other than those already undertaken — about $25,000] until its emergency rate increase request has been granted and additional capital financing for the next 'phased' improvements becomes available from either public, private or commercial sources." [4]

(5) HWC "states its intention to continue to examine the alternate methods (*including public ownership*) available to finance the additional capital improvements outlined in the Company's consulting engineers [sic] report and *upon securing a rate increase and additional financing*, [HWC] also states its intention to continue this 'phased' improvement program." [5] (Emphasis supplied.)

On April 20, 1978, the PSC held a public hearing in the matter, notice of which was given to HWC. Although counsel for HWC was present, no officer or employee of the company attended, which precluded any direct questioning of the company as to its intentions or financial ability to make the necessary or desired improvements. [6]

A number of HWC customers testified about the poor service they were receiving: inadequate supply manifested

---

**3.** The record does not reveal that the "phased" program suggested by Mooney was ever approved by the PSC.

**4.** The answer gave no indication of (1) what the difference was between private and commercial sources or (2) whether there was any reasonable expectation that sufficient capital funds could be generated from any of the three sources.

**5.** There is no mention in the Mooney report about public ownership. It was apparently discussed at the July 19 public hearing, however. It is highly significant that HWC recognized that option as a possible solution to the existing service problems.

**6.** The PSC was obviously not pleased with the absence of company personnel, and directed counsel to attempt to locate the company president. Counsel reported that he had made the attempt, but was unsuccessful.

by a low gallonage per minute; total cessation of service during summer droughts and winter freezes; rusty and malodorous water coming from the tap requiring special filters in the home that were in need of frequent replacement. One customer, who observed the water lines while the company was working on them, stated that they were "solid rust." Another customer complained about having to pay higher fire insurance rates because the water main serving the fire hydrants in her area was inadequate. The area was classified as "unprotected" by the insurance company due to insufficient water service.

Mr. Walter, on behalf of the Commission's engineering staff, iterated his earlier conclusion that the HWC system had failed to provide its customers with adequate water service. He noted that, serving only about 300 customers, HWC "has practically no capability for borrowing money, especially in the amounts necessary." Walter stated that if the system were publicly owned, federal grants sufficient to defray 50% of the total project cost were available; and that, as a result, even if HWC could borrow the necessary funds, the average annual cost to the customer would be considerably less under public ownership ($200 as opposed to $700). He advised the Commission that the State Department of Health and Mental Hygiene (DHMH) had directed the Washington County Sanitary Commission (WCSC) to perform a feasibility study of county ownership of the system. His conclusion from all this was that "public ownership and operation of this utility would be in the best interest of the customers."

Mr. Mooney, the consultant employed by HWC, also testified about the system's deficiencies and possible remedies. Among many other things, he observed:

> "Any company that is under a thousand customers has an inherent strike against it. It is insufficient to make logical business decisions, and so forth, in the present day environment. If you are below that, the costs to the customers are very high. *It almost of necessity calls for a subsidy or for the system to be*

*integrated with an overall system."* (Emphasis supplied.)

William Sloan, of MES, then described a study he had made for that agency comparing the costs to the customer of public vs. private operation of the company. If all of the improvements recommended by Mr. Mooney were made under *private* ownership, the annual cost to each customer would be about $719 a year. Under *public* ownership, the cost would be about $319 a year, and possibly as low as $200 a year if, in addition to the Federal 50% grant, a Farmers Home Administration loan became available to finance the remaining 50% of the capital cost.[7] In addition to the differential in capital costs, Mr. Sloan stated that the operating costs would also be less under public management ($27,490 as compared with $43,000), pointing out several specific areas of savings.

MES, said Mr. Sloan, was empowered to acquire and operate private water companies (*see* Md. Ann. Code, Natural Resources article, §§ 3-101(i), 3-104, 3-105), and had acquired or assumed the operation of a number of them. With respect to HWC, public ownership offered a partial solution. The system needed improvement, he said, "and public ownership will save the ratepayers 50 to 70 percent." Sloan made clear that he had not included in his figures for public ownership the cost of acquisition because he wasn't certain what that would be. He observed, however, that the company's balance sheet showed a net worth of only $22,800.

Michael Wojton, a sanitarian with DHMH, testified that, based on a sanitary survey of the HWC system conducted in the summer of 1977, he believed "the system is inadequate in terms of storage, in terms of source, wells, and also condition of the mains." Although water quality at the source was excellent, it deteriorated because of particulate

---

**7.** In making these calculations, Sloan accepted Mooney's estimates for Stages I and II (updated by 29% for contingencies, engineering, and inflation) and developed his own estimates for Stage III. The total cost he estimated at about $1,000,000. A Farmers Home Administration loan would apparently have permitted amortization of the non-grant portion of the cost over a 40-year period at 5% interest, which would lessen the annual debt service as compared with the requirements of a commercial loan.

matter in the lines. He saw no direct health hazard, but noted that the water might have an odor or have rust in it, and, for that reason, may be unpalatable. Indirect health problems might arise from the inability of customers to flush their toilets. As a result of the various deficiencies, DHMH had (1) sent a proposed consent order to HWC requiring prompt improvements (*see* Md. Ann. Code art. 43, §§ 391, 392), and (2) directed WCSC to study the feasibility of acquiring the system (*see* art. 43, §§ 388, 450). James Eckle, Chairman of WCSC, stated that WCSC would make every effort to comply with the DHMH order, although he preferred that HWC make the needed improvements on its own.

Following this testimony, there was some discussion between counsel and the Commission over the relative advantages and disadvantages of public ownership. Because no one from HWC (other than counsel) was present and no evidence had been offered on its behalf as to the company's current financial status, it was unclear whether the company would be able to finance the improvements on its own. As its answer noted, the pending application for rate increase did not include any consideration of capital improvements. It was left that HWC would submit to the PSC, *within 10 days,* a verified statement "with respect to the present plans of the company to improve service and its capability to obtain financing to improve service. . . ."

At the end of the hearing, counsel for HWC was asked whether he had discussed with his client its position regarding the pending investigation, and specifically whether it desired to continue operating. His response was as follows:

> "*I understand the company is most interested in turning over the company to some sort of public ownership* subject to negotiations with Maryland Environmental Services and Washington County Sanitary Commission.
>
> I think the first step from our point of view is we have to have some evaluation of the company. If the

public agencies are going to take the position that the company is worth $30,000, they are going to base it, as the Commission did in its rate case, the value of the company is based on assets acquired in 1902 or 1900, the turn of the century, *I don't see how we can go on.* I think the first step is to come to the reasonable value of the company. I think we should do that now before July 14." (Emphasis supplied.)

On May 5, 1978 — nearly 10 *months* (rather than days) after the hearing — HWC submitted its affidavit. In effect, it stated that the company had committed or expended $33,000 toward the Mooney-recommended improvements, but would be unable to complete the improvements without an additional rate increase. In its concluding paragraphs, the affidavit stated:

"9. Although Highfield Water Company has the capacity to finance the additional improvements outlined in Mr. Mooney's report and to continue to operated [sic] the Company, *it recognizes that public ownership of this system may benefit its customers through federal funding of the required improvements.*

10. Accordingly, Highfield Water Company is in the process of determining a fair market value of the Company *and is amenable to some form of public ownership, provided a fair and reasonable price can be agreed upon.*" (Emphasis supplied.)

On May 30, 1978, WCSC filed a preliminary report of its feasibility study. Based on the assumptions that (1) a $1.1 million capital improvement program would be required to upgrade the system, (2) a federal grant of $550,000 and a 40-year 5% federal loan for $550,000 were available, (3) there were 300 customers to be served, and (4) the cost of acquisition would be small, WCSC estimated that it could upgrade and operate the system under the Sanitary District Law (§ 28, Code of Public Local Laws of Washington

County) "with an approximate charge of $19-$20/month/service including operation, maintenance and debt service." It recommended a more comprehensive study, and said that it would become involved either at the request of HWC or upon order of MES.

The last submission to PSC was a follow-up memo on August 10, 1978, from Mr. Walter. He advised that (1) HWC's response to the DHMH order was late and unsatisfactory, (2) the Ft. Ritchie interconnection was still on an emergency basis and did not relieve the company of its responsibility to obtain an adequate source of supply, and (3) "no plans and specifications had been submitted for additional well supplies, replacement of any distribution mains or increased storage capacity."

On September 8, 1978, the PSC issued Order No. 63332, the subject of this appeal. Its provisions are described above.

With this background, we may dispose of the issues raised by HWC.

## (1) *Reinvestigation of PSC Findings*

Appellant argues that the trial court erred "in failing to consider seriously the numerous defects in the actions of the PSC" and complains about the court's "deference to the PSC's actions."

The assertion that the court failed to give serious consideration to appellant's complaint is simply not borne out in the record. The court did not agree with appellant's views, but it did consider them. Insofar as the court's "deference" to the PSC's findings is concerned, such deference is precisely what is required. *See* Md. Ann. Code art. 78, § 97; *Public Serv. Comm'n v. Balto. Gas & El.,* 273 Md. 357 (1974). Indeed, it has been said that a court "should not examine the facts in any case further than to determine whether there was substantial evidence to sustain the order. The findings of the Commission are subject to review, but when supported by evidence they are accepted as final." *Sports Daily v. Public Service Comm.,* 179 Md. 355, 365 (1941).

## (2) *Inadequate Notice*

Appellant complains that the notice it received (presumably Order No. 62553) directed it only to show cause why it should not be required to correct certain system deficiencies and gave no warning that its "right" to exercise its franchise was in jeopardy or that public ownership might be considered. In light of the ultimate action of the PSC, it therefore claims a lack of due notice, and thus a lack of fairness and due process.

Most of appellant's argument in this regard is in support of the maxim that a person is entitled to fair and adequate notice of administrative proceedings that will likely affect him in order that he may have a reasonable opportunity to defend his position and protect his rights. There is really no question about the validity of that maxim or about the possible sanctions for its violation. The problem for appellant is that it was not contravened in this instance.

Order No. 62553 was not issued in a vacuum, nor was the hearing held in one. The adequacy of HWC's service, the extent of improvements needed, its willingness and ability to undertake and complete those improvements, and the possible benefits of public ownership had apparently been discussed at some length at the July 19 hearing before the County Commissioners. The Mooney report made clear that a major capital improvement program was impracticable "in this limited customer situation where revenues do not produce any borrowing power." Appellant's own answer to the show cause order recognized the dilemma and noted its intention to examine "alternate methods (including public ownership) . . . ." The hearing was full of testimony and discussion concerning public ownership and the inability of HWC to provide adequate service. Counsel's closing statement is perhaps the clearest (and most damaging) expression of what the only feasible alternative seemed to be, followed closely by the post-hearing affidavit stating that the company was "amenable to some form of public ownership, provided a fair and reasonable purchase price can be agreed upon."

In light of all this, it is specious for HWC to claim surprise at the Commission's ultimate decision, to claim an unawareness that it might be found in violation of its statutory obligation (art. 78, § 28 (c)) to furnish adequate service, or that the Commission might conclude that the company was (and would continue to be) financially unable to provide adequate service, and as a result determine to pave the way for public ownership by revoking its right to exercise its franchise. We would observe, in this regard, that no objection was made by HWC to either the testimony or the discussion at the hearing about public ownership on the ground of inadequate notice; no request for rehearing on that ground was made at any time during the nearly 17-month period between the hearing and the order; and no request for rehearing or reconsideration was made after Order No. 63332 was issued.

(3) *Failure to Give Preference to HWC's Rate Case*

Appellant claims that the PSC erred in proceeding with the instant case without granting it a rate increase. The argument is based on a number of false premises.

We note first, as conceded several times by HWC, that its petition for rate increase did not include any consideration of capital improvements. Surely after the July 19 hearing in Washington County, if not before, HWC was aware of the need for such improvements and yet it declined to include the cost of them in its proposed rate structure. We may only assume from this that the company made a deliberate decision to divorce the two matters, and not have the adequacy of its service become an issue in the rate case. In any event, since the data supplied in the rate case took no account of any capital improvements, we fail to see how a determination of that case could significantly affect appellant's ability to complete the needed improvements. Secondarily, we observe that the rate case was, in fact, decided by the Commission on January 17, 1978 — nearly eight months prior to its final order in this case; and yet no request was made by HWC to reopen this case in order to take account of the decision in the rate case.

The evidence before the Commission from virtually every witness, including Mr. Mooney, was to the effect that absent truly exorbitant rates there was no practicable way in which HWC could finance the necessary improvements with only 300 customers being served. From all of this, we fail to see any merit to appellant's claim of improper scheduling of the two cases.

### (4) *Authority to Revoke Right to Exercise Franchise*

In revoking HWC's authority to exercise its franchise, the PSC acted pursuant to Md. Ann. Code art. 78, § 24 (a), which states that "[h]ereafter, no public service company shall exercise any franchise granted by law except to the extent authorized by the Commission."

Appellant makes a two-fold attack on the Commission's action. It argues first that the effect of the order was to revoke the franchise itself which the Commission has no authority to do, and second, that § 24 (a) applies only to a previously unexercised franchise — *i.e.,* to prior approval before commencement of the exercise — and does not permit revocation of authority where the franchise is currently being exercised. We see no merit in either argument.

It is true that a franchise itself, being a legislative grant, may not be revoked by the PSC, which is a regulatory body. *Charles Co. San. v. Charles Util.,* 267 Md. 590 (1973). Controlling the *exercise* of a franchise is not the same as revoking the franchise itself, however. As stated by the Court in *Worcester Elec. Co. v. Hancock,* 151 Md. 670, 678 (1927):

> "The powers conferred upon the commission are of a regulatory nature. They do not include either the granting or withdrawal of franchises, although the *exercise of rights under franchises* duly acquired by private corporations and of powers acquired by municipalities under legislative grants *may be permitted or prohibited by the commission,* subject to the right of appeal, in cases provided for by the

Public Service Commission Acts." (Emphasis supplied.)

Although the economic effect of an order revoking a utility's right to exercise a franchise could, in some instances, be tantamount to revocation of the franchise itself, it is not necessarily so. The franchise remains as a valuable asset which, under certain conditions, may be sold and which, in other hands, may again be exercisable. *See* art. 78, § 24 (b); *Crisfield v. Public Service Comm.,* 183 Md. 179, 192, *et seq.* (1944). It may thus have an intrinsic value apart from the ability to exercise it. There is nothing in the record before us to show that such is not the case here, and, even if the result would be otherwise under other circumstances, there is no basis here for us to conclude that the Commission's action was, in effect, the same as a revocation of the franchise itself.

Appellant's second line of attack proceeds from a misreading of *Jeweler v. Potomac Elec. Pow. Co.,* 217 Md. 458 (1958), which is not at all in point. *Jeweler* was a condemnation case in which the utility's right to condemn land for an extension of its lines was challenged. The Court held that the company had previously been authorized to exercise franchises that included the construction of transmission lines and thus did not need additional or specific authority from the PSC under § 24 (a) to construct or extend the particular lines in question.

Art. 78, § 1 (a) provides that the jurisdiction and power of the PSC extends to all public service companies "engaged in or operating a utility business in this State ... to the full extent permitted by the Constitution and laws of the United States." These powers, the statute says, "shall be liberally construed; and the Commission shall have the powers specifically conferred by this article and by any other law, and also all implied and incidental powers necessary and proper to carry out effectually [sic] the provisions of this article." The purpose (and effect) of this broad grant, said the Court of Appeals shortly after its enactment, "was to place all corporations handling public utilities under the

supervision and control of the Public Service Commission. . . ." *Gregg v. Public Service Commission,* 121 Md. 1, 30 (1913).

Supplementing § 1 (a) is § 56 of art. 78:

"The Commission shall supervise and regulate all public service companies subject to its jurisdiction to assure their operation in the interest of the public and to promote adequate, economical, and efficient delivery of utility services in the State without unjust discrimination, giving consideration to the public safety, the economy of the State, the conservation of natural resources, and the preservation of environmental quality. To these ends, the Commission shall enforce compliance by such companies with all the requirements of law, including, but not limited to requirements with respect to financial condition, capitalization, franchises, plant, manner of operation, rates, and service. The powers and duties enumerated specifically in this subtitle are not intended to limit the scope of the general powers and duties of the Commission provided for by this article."

It would be incongruous, in light of this broad mandate to superintend to the fullest extent the operations of public utilities, to construe § 24 (a) in the narrow context suggested by appellant. To conclude, as appellant would have us do, that once the PSC authorizes the exercise of a franchise it loses all control over that exercise would be to remove its ultimate ability to enforce its orders and thus to emasculate its ability to regulate, to perform its legislative duties. Neither the wording of § 24 (a), nor its purpose, would require or permit such a strained construction.

Accordingly, we conclude that the Commission did not exceed its statutory authority in passing Order No. 63332.

### (5) *Improper Taking of Property*

This is, in effect, a restatement of the themes argued above

— that the revocation of the exercise of the franchise amounted to a taking of appellant's property in the absence of proper procedure and without just compensation. Restatement of the arguments does not enhance their validity, however.

The PSC did not "take" appellant's property, and thus owes it no compensation. After proceedings that dragged on for over a year, it became convinced that appellant was not providing adequate service, was making no reasonable effort to do so, and was not financially able to do so. It therefore revoked the company's authority to provide an inadequate service.

The Commission's order does not amount to a condemnation. Should MES or WCSC acquire the HWC operation, it will be required to pay the fair market value for it. *See* Md. Ann. Code, Natural Resources article, § 3-104; art. 43, §§ 409, *et seq.*; Code of Public Local Laws of Washington County, § 28-20. What that value may be is not now before use.

*Judgment affirmed; appellant to pay the costs.*