**DELMARVA POWER & LIGHT COMPANY, Plaintiff Below–Appellant,**

v.

**CITY OF SEAFORD, Defendant Below–Appellee.**

Supreme Court of Delaware.

Submitted: Oct. 17, 1989.
Decided: May 8, 1990.

Richard E. Poole and Gregory A. Inskip (argued), Potter, Anderson & Corroon, Dale G. Stoodley, Wilmington, for appellant.

James A. Fuqua, Jr., City Sol., Seaford, Frederick L. Miller, Jr. and Janice L. Lower (argued), Duncan, Weinberg, Miller & Pembroke, P.C., Washington, D.C., of counsel, for appellee.

Before CHRISTIE, C.J., MOORE, J., and BERGER, Vice Chancellor (sitting by designation pursuant to Del. Const. art. IV, § 12).

CHRISTIE, Chief Justice:

This is an appeal from a grant of summary judgment in favor of the appellee, City of Seaford (Seaford). The Superior Court held that there were no material issues of fact in dispute and that the appellant, Delmarva Power & Light Company (Delmarva), was not entitled to a claim for inverse condemnation as a matter of law when two of its customers changed their electrical service to Seaford's municipal utility after the property on which they were located was annexed by Seaford.

The parties agree on the facts which gave rise to this dispute, and we will recite the Superior Court's summary from its opinion. Delmarva is a Delaware corporation engaged in the business of selling electric power to wholesale and retail customers. Seaford is an incorporated city and a municipal corporation of the State of Delaware operating under a home rule charter.

Seaford operates its own electric utility company, Seaford Light & Power Company (Seaford Power), primarily for the purpose of selling electricity to private and commercial residents of Seaford.

Until December of 1985, Delmarva sold electric power at retail to the Seaford Wesleyan Church and Parsonage (the Church) located at 13 North Front Street. These properties have been within Seaford's municipal limits since 1981, having been properly annexed by the city in August of that year. At the request of the Church in August, 1985, Seaford took steps to provide service to these properties as customers of Seaford Power. The Church requested that Delmarva cease service, and the change took place on December 5, 1985.

Until November 10, 1986, Delmarva sold electric power at retail to the Seaford Golf and Country Club (Country Club) located on West Locust Street. This property was annexed by Seaford on January 25, 1982. On May 7, 1986, the Country Club informed Delmarva that it wished to change service from Delmarva to Seaford Power, and this was accomplished on November 10, 1986.

Delmarva filed a complaint against Seaford claiming that there had been inverse condemnation of its service account with the Church which it held pursuant to franchises which were granted to Delmarva by the State of Delaware and its agent, Sussex County Levy Court. Thereafter, Delmarva filed a second complaint based on the change in service by the Country Club. Both complaints charged that Seaford had appropriated property rights of Delmarva without instituting formal condemnation proceedings. It was alleged that Seaford's action in taking over these accounts amounted to a taking for public use without compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, sections seven and eight of the Delaware Constitution. The complaints were consolidated in Superior Court pursuant to Superior Court Civil Rule 42(a).

After considering the evidence in the light most favorable to Delmarva, the Su-

perior Court concluded that Seaford was not required as a matter of Delaware law to compensate Delmarva for a taking of its property interest in the accounts in question. The court held that *both* of the parties possessed valid franchises to serve these customers, but that Seaford Power's franchise prevailed because Delmarva's franchise was limited by the municipal powers granted to the city of Seaford. The Superior Court ruled that once Seaford adopted its home rule charter in 1961, the political duties and powers which it assumed within the city limits, including areas later annexed, extinguished any franchise rights of Delmarva which conflicted with those of Seaford Power. The court also found it significant that the customers chose to switch service to Seaford Power and were not forced to do so. We disagree with this conclusion, and for the reasons stated herein, we reverse.

 The standard of review for an appeal from a grant of summary judgment is whether the court below committed an error of law. *duPont v. duPont*, Del. Supr., 216 A.2d 674, 680 (1966). The Court may review the controversy *de novo*, including all pleadings, evidence, and all portions of the record below, as well as the opinion and decision of the lower court. *Bershad v. Curtiss–Wright Corp.*, Del. Supr., 535 A.2d 840, 844 (1987). The facts leading to the controversy must be reviewed in the light most favorable to the appellant, the non-moving party below. *Alexander Indus., Inc. v. Hill*, Del.Supr., 211 A.2d 917 (1965). A motion for summary judgment "must be denied if there is any reasonable hypothesis by which the opposing party may recover." *Vanaman v. Milford Memorial Hosp., Inc.*, Del.Supr., 272 A.2d 718, 720 (1970).

·I.

The appellant, Delmarva, argues that it possesses an exclusive franchise granted to it by the State of Delaware. The exclusivity of this franchise, it is argued, is based on a combination of factors including a) the authority granted to it by statute, b) the terms of a franchise grant from Sussex County, and c) the fact that Delmarva is regulated by the Public Service Commission. Delmarva contends that because it owns an exclusive franchise, it owns a vested property right which cannot be usurped by a governmental entity without compensation. *City of Owensboro v. Cumberland Tel. & Tel. Co.*, 230 U.S. 58, 72, 33 S.Ct. 988, 993, 57 L.Ed. 1389 (1913).

 A franchise is a right or privilege conferred by the state to a grantee, usually for the provision of some public purpose. *Blair v. Chicago*, 201 U.S. 400, 26 S.Ct. 427, 439, 50 L.Ed. 801 (1906); *Greater Wilmington Transp. Auth. v. Kline*, Del.Super., 285 A.2d 819, 822 (1971). Because of this public purpose, any ambiguity regarding the nature of this grant must be construed strictly against the donee. *Knoxville Water Co. v. City of Knoxville*, 200 U.S. 22, 50, 26 S.Ct. 224, 227, 50 L.Ed. 353 (1906). In particular, exclusivity is not favored and will only be recognized if it is explicit in the terms of the franchise. *Pearsall v. Great Northern Ry. Co.*, 161 U.S. 646, 664, 16 S.Ct. 705, 709, 40 L.Ed. 838 (1896). Thus, we must look to the original franchise grant to Delmarva to determine its exact nature.

Delmarva contends that its right to serve customers in Sussex County was established initially by statute. In 1899, the Delaware General Assembly passed the original version of what is now 26 *Del.C.* §§ 906, 907.[1] This statute confers a broad

---

**1.** 26 *Del.C.* § 906. *Powers and duties of electric utility corporations; regulation of use of public roads, streets, etc.*

(a) Every corporation organized under Chapter 1 of Title 8 for the purpose of constructing, maintaining and operating works for the supply and distribution of electricity for electric lights, heat or power, in addition to the powers conferred upon corporations generally, may use the public roads, highways, streets, avenues and al-

leys in this State for the purpose of erecting posts or poles on the same to sustain the necessary wires and fixtures. The consent of the council, town commissioners or other persons having control over the public roads, highways, streets, avenues and alleys of the city, town and district in or upon which the posts or poles are to be erected shall first, and as a condition precedent, be obtained.

grant of authority to public utilities to use public roads as conduits for providing electrical service. This Court has held that the statute grants a general authority or franchise to companies such as Delmarva. *Eastern Shore Pub. Serv. Co. v. Town of Seaford*, Del.Supr., 2 A.2d 265, 268 (1938), *appeal dismissed*, 306 U.S. 616, 59 S.Ct. 483, 83 L.Ed. 1024 (1939). In order for public utilities to operate within the boundaries of municipalities, the statute requires that they must first obtain the consent of the municipality as a condition precedent to entering and serving inside the municipal territory. The municipality may impose reasonable restrictions on this franchise, including limiting its duration. *Id.* By its language, however, the franchise granted by this statute is not exclusive as to other public utilities or as to municipal utilities.

In 1900, a predecessor of Delmarva received a specific franchise grant from the Levy Court of Sussex County. The grant conferred to Delaware Electric Company the right to "use the streets and highways of Sussex County for the purpose of erecting poles or carrying wires ... for transmitting electricity." [2] The county retained the general authority to regulate the location and installation of poles and wires so as to not "interfere with or hinder the public in the use of said Streets or Highways." *See* n. 2. The grant did not refer to the duration of this use, its revocability, or its exclusivity.

In 1901, Delaware Electric Company was succeeded by Laurel–Seaford Electric Light Company which, pursuant to the grant, erected poles and provided electrical services inside Seaford. *Eastern Shore*, 2 A.2d at 267. It operated under a five-year contract with Seaford, which was negotiated in 1907. In 1909 it sold its business, including its franchises and other rights, to Sussex Light and Power Company. This company

---

(b) No posts or poles shall be erected in any street of any city or incorporated town except in those streets which are designated by the authorities thereof and then only in such place and manner as is thus designated, and the same shall be so located as in no way to interfere with the safety or convenience of persons traveling on or over the streets, highways and roads. The use of the public streets in any of the cities and incorporated towns of this State shall be subject to such regulations and taxation as may be first imposed by the corporate authorities of such cities and towns.

(c) No posts or poles shall be erected upon the soil or property of any person without first obtaining the consent in writing of the owner of the soil or property.

(d) Any wire crossing a railroad shall not be at a less elevation than 23 feet.

§ 907. *Laying pipes, conduits or wires by electric utility corporations.*

Every corporation mentioned in § 906 of this title may lay pipes, conduits or wires beneath the public roads, highways, streets, avenues and alleys as it deems necessary. The pipes, conduits and wires shall be laid at least 2 feet below the surface of the same and shall not in any way unnecessarily obstruct or interfere with public travel or damage public or private property. No public streets shall be opened for such purpose without the consent of the counsel of any city, or the town commissioners of any incorporated town, or other persons having control over the public roads, highways, streets, avenues and alleys. Such use of the public streets in any of the cities and towns of this State shall be subject to such regulations, taxation and re-

strictions as may be first imposed by the corporate authorities of such cities and towns.

**2.** The complete text of this grant states:

Be it resolved by the Levy Court of Sussex County at the July Session A.D. 1900, that THE DELAWARE ELECTRIC COMPANY its successors and assigns, be and the same is hereby authorized to use the Streets and Highways of Sussex County for the purposes of erecting poles for carrying wires, and the placing of wires on the same, for transmitting electricity for light, heat and power, or for building and maintaining of subways for the transmitting electricity for light, heat and power.

PROVIDED that all poles placed by the said Company on the Streets or Highways of the said County shall be placed or set on the extreme side limit of the said Streets or Highway and in all cases where the wires of the said Company shall cross the said Streets or Highways they shall be placed at such a distance from the ground as not to interfere with or hinder the public in the use of the said Streets or Highways.

AND PROVIDED FURTHER that all subways built by said Company uponnthe [sic] Streets or Highways of the said County shall be built under and along the extreme side limit of the said Streets or Highways, and in all cases where the wires of said Company cross the said Streets or Highways the said Subways shall be run directly across said Streets or Highways and at such depth that the same shall not interfere with or hinder the public in the use of said Streets or Highways.

July 10, 1900

continued to service Seaford and it entered into a second five-year contract in 1911. In 1915, the power company requested that Seaford pass an ordinance granting it permission to continue to operate in Seaford for twenty years, and Seaford agreed and adopted such an ordinance. Sussex Light and Power Company was sold to an entity which in 1935 was supplying power to Seaford under the ordinance as Eastern Shore Public Service Company (Eastern Shore). When the twenty-year ordinance period expired, Seaford did not renew it. Instead it withdrew its consent and passed an ordinance directing Eastern Shore to remove its poles, wires, and fixtures from the Seaford city limits. *Id.* Eastern Shore contested this action by Seaford, but the Court of Chancery held that since the consent given in 1915 had expired, the city could cause the removal of the company's property from its streets. *Town of Seaford v. Eastern Shore Pub. Serv. Co.*, Del.Ch., 191 A. 892, 899 (1937). In 1936 Seaford granted a twenty-year franchise to a new company, Seaford Light & Power Company. By the terms of the resolution of the town council, that franchise was non-exclusive, and Seaford had the option to purchase that electric company within five years. *Id.* at 895. Seaford did in fact exercise that option, and it has operated its own municipal utility within its city limits since 1938.

In 1930, Eastern Shore was granted a "right" to erect and maintain poles, and to string wires over and along all roads and highways within the limits of Sussex County over which the Levy Court had jurisdiction.[3] Appellee, which succeeded to Eastern Shore's interests, points to this grant

as an additional source of its exclusive franchise. This document refers to the grant's revocability and describes no duration. It makes no reference to it being exclusive. Under this and the prior grant, however, as well as its authority granted by statute, Delmarva has continued to provide electrical service in Sussex County outside of Seaford's municipal boundaries since 1937.

To summarize the first fifty years of Delmarva's franchise, a general authority to operate was granted initially to all public utilities by statute, but limited by requiring the consent of municipalities in which they operated. An authority to use the county highways as conduits was granted directly to a predecessor of Delmarva by the Sussex County Levy Court in 1900. A second grant to another predecessor took place in 1930. The history of the dispute with Seaford reveals that the municipality was able to limit this franchise by circumscribing its consent for the exercise of the franchise within its boundaries to a duration of twenty years. Delmarva was ordered by the Court of Chancery to cease service inside Seaford after November 30, 1937. While Delmarva is the only public utility providing electrical service to the areas bordering Seaford, and it possesses a valid franchise to do so, it cannot be said that by the terms of its franchise it possesses exclusive rights to that area.

In 1949 Delmarva became subject to regulation by the Public Service Commission of Delaware (the Commission). Delmarva argues that this regulation elevates the status of its franchise to an exclusive one. The Public Utilities Act of 1974 (the Act),

---

**3.** The complete text of the grant states:

BE IT RESOLVED by the Levy Court of Sussex County, Delaware, that the right, revocable at the pleasure of the Levy Court, to erect and maintain poles and to string wires thereon, be and the same hereby is granted to and vested in Eastern Shore Public Service Company, a corporation of the State of Delaware, its successors and assigns, over and along all roads and highways within the limits of Sussex County over which the said Levy Court of Sussex County has jurisdiction, and provided that all such poles and wires be erected and located on the extreme side of such County Roads so as in nowise to

interfere with the free and unimpeded use of said County roads for vehicular or other traffic.

BE IT FURTHER RESOLVED that whenever said Eastern Shore Public Service Company desires or proposes to erect poles and string its wires along any of the County roads under the jurisdiction of the Levy Court of Sussex County, notice of its intention so to erect poles and string wires shall be given to the County Engineer of Sussex County, and all poles so to be erected on and along said County roads shall be erected under the supervision and according to the instructions of the County Engineer of Sussex County.

the statute which governs the facts of this case, requires that public utilities must obtain a certificate of public convenience and necessity to begin or extend their operations. 26 *Del.C.* § 203A(a).[4] Additionally, a public utility may not cease operations or service without approval of the Commission. 26 *Del.C.* § 203A(c)(1).[5] Delmarva contends that Delaware courts have described such regulation as creating "a legalized monopoly." *Diamond State Tel. Co. v. Pub. Serv. Comm'n,* Del.Supr., 367 A.2d 644, 646 (1976). It then asserts that the status of being a legalized monopoly by virtue of regulation is the same thing as having an exclusive franchise. Delmarva also argues that by virtue of its regulation by the Public Service Commission, it is obligated to serve all customers at regulated rates in return for protection from competition. This results in Delmarva having the exclusive right and duty to serve the two customers in this case. This exclusive right constitutes a vested property right, Delmarva contends, for which it should have been compensated when Seaford appropriated the customers. *City of Jackson v. Creston Hills, Inc.,* 252 Miss. 564, 172 So.2d 215 (1965); *Town of Coushatta v. Valley Elec. Mem. Corp.,* La.App., 139 So.2d 822 (1961).

The appellee, Seaford, contends that the Public Service Commission is not empowered by the legislature to grant franchises to public electric utilities such as Delmarva, and that the certificate of public convenience and necessity does not confer a property right.[6] Because this is the case, Seaford argues, Delmarva possesses only a non-exclusive franchise which is not a vested property right, but one which can be lost as a result of competition. The appellee cites a Delaware Superior Court case which interprets the certificate to be merely a license and not a franchise. *Greater Wilmington Transp. Auth. v. Kline,* Del.Super., 285 A.2d 819, 823 (1971). In the *Kline* case, the Superior Court analyzed the role and powers of the Public Service Commission as described by the statute then in force. 26 *Del.C.* § 162 (essentially the same language as now appears in 26 *Del.C.* § 203A(a)). It held that the Commission was "essentially a regulatory body which performs certain legislative functions where specifically authorized by statute." *Kline,* 285 A.2d at 822 (1953). With regard to a certificate of convenience and necessity for bus routes, the court held that it was "a mere license that can be amended or revoked at will by the grantor. Such being the case it is personal in its character, is not transferable and does not

---

4. 26 *Del.C.* § 203A *Certificate of public convenience and necessity; abandonment or discontinuance of business, operations or service.*

 (a)(1) Subject to the provisions of subsection (b) of this section and §§ 102, 201 and 202 of this title, no individual, copartnership, association, corporation, joint stock company, agency or department of the State, cooperative, or the lessees, trustees or receivers thereof, shall begin the business of a public utility nor shall any public utility begin any extension of its business or operations without having first obtained from the Commission a certificate that the present or future public convenience and necessity requires or will require the operation of such business or extension.

 (2) This section shall not be construed to require any public utility to secure such a certificate for any extension within the perimeter of any territory already served by it.

 (3) The Commission, after hearing, on the complaint of any public utility claiming to be adversely affected by any proposed extension, may make such order and prescribe such terms and conditions with respect to the pro-

posed extension as may be required by the public convenience and necessity.

5. This section was approved July 13, 1983, 64 Del.Laws, c. 150, § 1.

 26 *Del.C.* § 203A(c)(1) No public utility shall abandon or discontinue, in whole or in part, any business, operations or services provided under a certificate of public convenience and necessity or otherwise which are subject to jurisdiction of the Commission without first having received Commission approval for such abandonment or discontinuance.

6. The appellee points out that Delmarva does not even hold such a certificate, because it began operations in the contested territory before the statute was passed, and is thus exempted from that requirement unless it extends the geographic area in which it provides service. 26 *Del.C.* § 203A(a)(2). While this may be the case, there is nothing to indicate that Delmarva is not subject to the same rights and obligations under this regulatory statute as a utility which actually holds a certificate.

pass by succession. It is purely a regulatory measure that vests no right in the holder." *Id.* at 823; *accord, Highfield Water Co. v. Pub. Serv. Comm.,* 46 Md.App. 332, 416 A.2d 1357 (1980).

Delmarva points to a distinction made in *dicta* by the court in the *Kline* case between the powers of the Commission over bus routes and its powers regarding electric utilities such as Delmarva. Addressing that point, the court stated that the legislature had given the Commission the authority to grant franchises to those utilities referred to in 26 *Del.C.* §§ 906, 907, because

> [t]he inherent requirement in those industries for high initial capital outlay of a permanent nature dictates that for the protection of the public service company and consequent maintenance of service that the legal relationship between sovereign and company be framed in terms of a mutually binding contract or franchise.

*Kline,* 285 A.2d at 822–23 (citing *Penn–York Natural Gas Corp. v. Maltbie,* 164 Misc. 569, 299 N.Y.S. 1004 (1937)). Our previous decisions indicate that by enacting 26 *Del.C.* §§ 906, 907, the General Assembly intended for the State to confer franchises to companies such as Delmarva. *See Eastern Shore Pub. Serv. Co. v. Town of Seaford,* Del.Supr., 2 A.2d 265 (1938), *appeal dismissed,* 306 U.S. 616, 59 S.Ct. 483, 83 L.Ed. 1024 (1939). However, to the extent that *dicta* in the *Kline* case indicates that this statute confers authority to the Commission to grant franchises to such utilities, we do not view that *dicta* as persuasive in this case. We hold that, inasmuch as a franchise constitutes a contractual relationship between the sovereign grantor and a public utility grantee, the Commission regulates that relationship on behalf of the grantor. There is no question that the grantee's obligations resulting from this contract can involve enormous expense and permanent investment. In this regard, once a franchise is granted, the grantee possesses a private right which will be protected by the sovereign according to the terms of the franchise. This describes the contractual aspect of a franchise, but franchises have a dual character in that they involve services which are public in nature. In this regard the grantee may be burdened by the sovereign in order to meet the needs of the public. *See* 36 Am.Jur. *Franchises* § 4 (1968); *Knoxville Water Co. v. City of Knoxville,* 200 U.S. 22, 26 S.Ct. 224, 50 L.Ed. 353 (1906). We find the holding of the *Kline* case to be correct insofar as it is indicated in that opinion that under the statute a certificate of convenience and necessity represents a function of regulation by the Commission, and the certificate in and of itself does not confer or represent an exclusive property right. *Tenn. Elec. Power Co. v. Tenn. Valley Auth.,* 306 U.S. 118, 141, 59 S.Ct. 366, 371, 83 L.Ed. 543 (1939); *contra, Town of Culpeper v. Va. Elec. and Power Co.,* 215 Va. 189, 207 S.E.2d 864 (1974). The certificate is a creature of the Commission and operates only to define the rights among these utilities which are subject to Commission regulation.

We agree with appellee Seaford that Delmarva does not possess an exclusive franchise from the State of Delaware strictly by virtue of its being regulated by the Public Service Commission. The General Assembly has indicated this intent in the Act defining the powers and jurisdiction of the Commission. Public utilities are defined in the statute to include electric and gas providers such as Delmarva. 26 *Del.C.* § 102(2). Such a public utility shall not begin or extend any of its operations without first obtaining "a certificate that the present or future public convenience and necessity requires [such an action]." 26 *Del.C.* § 203A(a)(1) (*see* n. 4). Through this certification authority, the General Assembly intended to "balance the interests of the consuming public and of the regulated public utilities." 59 Del.Laws, c. 397, § 1 (Statement of purpose). In its discretion the Commission is empowered to "define or limit the territory or territories in this State within which the activities authorized by the certificate may be conducted." 26 *Del.C.* § 203A(b)(3). This limitation of competition results in a regulated monopoly of one public utility per area. It reflects a policy that is "the product of many years

of unhappy experience with the evils of uncontrolled monopoly, and the resulting ills visited on the public by speculative schemes, unwarranted competitive practices, and unsatisfactory service." *City of Dover v. Del. Power & Light Co.*, Del.P.S.C., 3 P.U.R.3d 181, 191 (1953). The statute does not refer to this certificate as a franchise, however, and it appears to this Court that this was not intended to be a franchise.[7]

Two decisions by the Commission shed light on the standards that are applicable to granting a certificate and in doing so, articulate the public policy of this State. In the first case, Delmarva sought and was denied a certificate to supply electricity to the Dover Air Force Base. *City of Dover v. Del. Power & Light Co.*, Del.P.S.C., 3 P.U.R.3d 181 (1953). The Commission ruled that because the city of Dover had been providing electricity to the base in the past, the Commission would follow a policy of protecting the "pioneer utility" unless its services were proven to be inadequate or unsatisfactory. This principle will prevail unless it can be shown that the convenience and necessity of the public as a whole will require competition. *Id.* at 191. In the second case, the Commission applied the same principle of protection for the "pioneer utility" to deny Delmarva a certificate to serve Mallard Lakes, a townhouse development in Sussex County. *In the Matter of the Application of Delmarva Power & Light Co. for a Certificate of Public Convenience and Necessity to Provide Electrical Service to Mallard Lakes*, Del.P.S.C., Dkt. 84–20, Crosse, Hearing Examiner (July 12, 1985), *aff'd*, Del.P.S.C., Order No. 2685 (November 5, 1985). In that case, the Commission stated that "it is the policy of this state to protect the pioneer utility or prevent competition by preventing needless duplication of facilities. However, where it can be shown that the public convenience is served by permitting competition, competition will be allowed." *Id.* These holdings properly articulate the public policy of this State.[8]

Delmarva argues that by virtue of the certificate of necessity and public convenience, it owns an exclusive franchise. The public policy of the State supports this assumption as to other public utilities which are also regulated by the Commission. To that extent, the certificate constitutes a valuable property right, which cannot be taken from it without due process of law. *Union Rural Elec. Assoc., Inc. v. Town of Frederick*, Colo.Supr., 670 P.2d 4, 8 (1983). The cases summarized above demonstrate that only when the Commission is persuaded that the utility is providing inadequate or unsatisfactory service will it impair the utility's use of the certificate. The Commission is the exclusive arena for disputes of this sort among public utilities. 26 *Del.C.* § 203A(a)(3).

On the other hand, the Public Service Commission has no jurisdiction over municipal utilities such as the one owned by Seaford. 26 *Del.C.* § 202(a).[9] Thus, the exclusivity warranted by the certificate operates only to protect Delmarva from competition from other regulated utilities, not municipal utilities such as Seaford Power. The

---

7. In another section of the Act, the legislature explicitly conferred power upon the Commission to grant franchises to cable television systems that desire to operate outside the boundaries of municipalities which may also grant franchises. 26 *Del.C.* § 601(a). The subchapter details the procedures, rights, and obligations of the franchisor and franchisees. We find it significant, given the argument raised by appellant, that the legislature did not grant a similar franchising power to the Commission for public utilities other than cable television systems.

8. Subsequent to the decision in *Mallard Lakes*, the General Assembly adopted 26 *Del.C.* § 203B, which authorizes the Public Service Commission to establish service territories. The amend-

ment became effective on June 19, 1987, and for that reason is not applicable to this case. It does not appear to this Court, however, that the amendment changes the public policy of this State or the role of the Commission as described in this opinion.

9. 26 *Del.C.* § 202. *Limitations on jurisdiction of Commission.*

(a) The Commission shall have no supervision or regulation over any public utility or over the rates, property, property rights, equipment, facilities, service territories or franchises of any public utility that is municipally owned or any municipal electric company formed pursuant to Chapter 13 of Title 22.

statute granting authority to the Public Service Commission explicitly limits its authority and thus the protection it can afford holders of its certificates. *In Re Delaware Power & Light Co.*, Del.Super., 99 A.2d 270, 273 (1953). Contrary to Delmarva's argument, the certificate of public necessity and convenience does not operate as an exclusive franchise against Seaford. It does, however, confer other valuable property rights.

The United States Supreme Court addressed the relative rights of utilities which hold non-exclusive franchises subject to regulation by state agencies in 1939. *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939). In that case, the Court held that owners of non-exclusive franchises which lost business due to competition from the federally-owned Tennessee Valley Authority (TVA) had no standing to sue, because their loss was "damnum absque injuria,—a damage not consequent upon the violation of any right recognized by law." *Id.* at 137, 59 S.Ct. at 369, 83 L.Ed. 543. The Court also stated that "[t]he local franchises, while having elements of property, confer no contractual or property right to be free of competition either from individuals, other public utility corporations, or the state or municipality granting the franchise." *Id.* at 139, 59 S.Ct. at 370, 83 L.Ed. 543. Seaford argues that this decision supports its position that Delmarva's non-exclusive franchise cannot prevent uncompensated losses due to competition. While the Supreme Court has never overruled its holding in this case, it has broadened the requirements for standing, and it is likely that the Court would hold today that the rights that the public utilities did own were sufficient to support standing to sue for damages against losses incurred by the creation of the TVA. *See Assoc. of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). More significantly, the statute creating the TVA was amended in 1959 to prohibit the TVA from expanding its service areas. This represented an apparent effort to protect the business of the remaining public utilities. *Hardin v. Ky.*

*Util. Co.*, 390 U.S. 1, 2, 88 S.Ct. 651, 653, 19 L.Ed.2d 787 (1968). Thus, Congress limited the competition among utilities in the TVA markets and provided a statutory basis for standing for holders of non-exclusive franchises. Inasmuch as this 1939 United States Supreme Court decision describes owners of non-exclusive franchises operating under certificates of public necessity and convenience as having no compensable rights, we deem that ruling to be limited to the particular procedural posture and facts of that case. We do not regard it as authority for defining the property rights of the parties in this case.

■ After examining each of the sources of its franchise propounded by the appellant, we concur with the finding of the Superior Court that Delmarva owns a non-exclusive franchise in Sussex County. This franchise derives from statute and from grants from the Sussex County Levy Court in 1900 and 1930. These grants do not explicitly confer an exclusive right to be free from competition from other utilities. As a public utility, the statute authorizes it to use public roads as conduits for electrical service, subject to the consent of municipalities in which it operates. 26 *Del.C.* §§ 906, 907. Delmarva is regulated by the Public Service Commission, but this regulation does not in and of itself grant a franchise. The Commission is authorized, however, to promote the State's policy of restrictive competition for customers among regulated public utilities by using the regulatory device of the certificate of public necessity and convenience. 26 *Del.C.* § 203A. Additionally, while the Commission may restrict competition among utilities over which it has jurisdiction, it is prohibited from exercising jurisdiction over municipal utilities such as Seaford Light & Power Company. 26 *Del.C.* § 202. The fact that Delmarva enjoys an exclusive right to serve certain of its customers by virtue of its regulation by the Commission does not establish that Delmarva has a corresponding exclusive right to serve properties located in Seaford. The combination of the franchise and the certificate, however, constitutes a property right as to

customers served by Delmarva, which cannot be taken without due process.

## II.

Seaford claims that by virtue of its authority as the municipality within which the properties are situated, its right to serve the two customers supersedes any non-exclusive franchise rights which Delmarva had when the city limits were extended. When Seaford adopted a new city charter in 1961, it argues, Delmarva knew that Seaford obtained additional authority with regard to the area within the city or within one-half mile of its borders. Thus, Delmarva became subject to the risk that it would lose its franchise for those customers in the future, and any loss which it has suffered was a business loss due to competition and preference of the customers and was not a compensable taking.

To analyze the merits of this argument, we must examine the nature of Seaford's rights and powers as conferred by the laws of Delaware, much as we have done in determining Delmarva's rights. The Town of Seaford originally had authority to "provide lamps and to light the streets and public places of every description in said town." 29 Del.Laws c. 153 § 19 (March 1, 1917). This provision allowed Seaford to grant franchises for that purpose, and it did grant a twenty-year franchise to Delmarva's predecessor in 1915. On September 8, 1936, Seaford withdrew its consent from that company and granted a non-exclusive franchise to Seaford Light & Power Company for twenty years. *Simon v. Town of Seaford*, Del.Supr., 197 A. 681, 683 (1938). Seaford exercised its option to

purchase that company and has operated it as a municipally-owned utility within its borders since October 15, 1938. *Town of Seaford v. Eastern Shore Pub. Serv. Co.*, Del.Super., 24 A.2d 436, 440 (1942). In 1961, the Delaware General Assembly authorized a new home rule charter (the Charter) for Seaford which included the authority to provide electrical service to communities within one-half mile of its city limits.[10] This Charter also granted Seaford the authority to annex new territory. 53 Del.Laws c. 42. Both the Church and the Country Club were located within this one-half mile area, and the lands which they occupy were annexed by the city in 1981 and 1982 respectively. The record reveals that the change in service in 1985 and 1986 was not the result of any coercion by Seaford, nor has Seaford sought to prevent Delmarva from continuing to provide service to its other customers within the annexed territory.

Seaford has contended in its brief and at oral argument that its right to provide electrical service outside of its boundaries functioned to extinguish Delmarva's franchise to serve the contested customers. The alleged effective date of this extinction was May 5, 1961, the date upon which the Charter was approved by the General Assembly. Delmarva was on notice at that point, it is argued, that its continuing service to the customers within one-half mile of Seaford was now subject to the right of Seaford to expand and to provide utility services in that area. The Superior Court adopted this position in its grant of the summary judgment motion. We believe that this view insofar as it deprives Delmarva of the right

---

**10.** Section 32 of the Charter authorizes Seaford: To contract with or to grant franchises, concessions or rights of any person, persons, firm, partnership or corporation who may apply for ... the use of any street, highway, avenue, lane, alley or other City property, for the construction and operation of ... electric light power and water plants and distribution system. To make and establish rules and regulations, by ordinance or resolution, for the manufacture and sale of electric current, including the establishment of a service charge, in said City and *within one-half mile of the Corporate limits thereof* (emphasis supplied).

Additionally, section 35(G) of Seaford's Charter states: In the event the City of Seaford should construct or acquire any plant, machinery, appliances or equipment for the supply of electricity or gas for light, heat or power purposes, authority is hereby granted the City of Seaford to furnish electricity or gas for light, heat or power purposes to the outlying communities provided that *this authority shall not exceed a distance of One-half Mile beyond the limits of said City* ... and to do all things necessary to carry out this authority (emphasis supplied).

to compensation for loss of existing customers is contrary to the law governing municipal corporations and prior decisions of this Court.

The Superior Court relied on a North Carolina Supreme Court case, *Stillings v. City of Winston–Salem*, 311 N.C. 689, 319 S.E.2d 233 (1984); *accord, City of Estacada v. Am. Sanitary Serv.*, 41 Or.App. 537, 599 P.2d 1185 (1979). In that case, three garbage collection businesses had been granted exclusive five-year franchises by Forsyth County to provide their services in certain areas which were outside the city limits of Winston–Salem. During that five-year period, Winston–Salem annexed portions of the areas served by the franchisees and, pursuant to statute, began to furnish free garbage collection to the residents of those areas. Although there was no claim that Winston–Salem interfered with or obstructed the private companies in any way, their businesses diminished because their customers chose the city's free service. The private companies sued the city for inverse condemnation, contending that the value of their franchises had been so impaired as to constitute a taking for which they were owed compensation. The court held that no taking had occurred. *Id.* 319 S.E.2d at 237. It determined that the franchises were a function of the authority and power of the sovereign which granted them. Because the county only had authority over territory which was outside the boundaries of cities, the franchises were granted necessarily subject to changes of those boundaries. The franchise to serve territory incorporated by the city could not be protected by the county and, therefore, was no longer valid. For this reason, the property rights of the exclusive franchisees were extinguished in those annexed territories. The court also

stated that as long as the city had not passed an ordinance to the contrary, the garbage companies were free to compete with the city in those territories if they chose. *Id.* at 238. *See also, Calcasieu Sanitation Serv. v. City of Lake Charles*, La.App., 118 So.2d 179 (1960).

We find this case to be distinguishable for two reasons. To begin with, the franchises originally granted to Delmarva were not limited to territory only outside the city limits. The franchisor was the State of Delaware. To the extent that the franchises were limited, they were limited by the requirement that a utility may not operate within a municipality without its consent. 26 *Del.C.* §§ 906, 907. Neither of the grants of 1900 and 1930 which were granted by Sussex County, limited the territory in which the utility could operate. As the history recounts, the predecessors of Delmarva operated inside the City of Seaford until 1938. At that time, this Court held that the consent provisions of the statute empowered the city to limit the duration of the use of a franchise inside its boundaries. *Eastern Shore Pub. Serv. Co. v. Town of Seaford*, Del.Supr., 2 A.2d 265, 268 (1938), *appeal dismissed*, 306 U.S. 616, 59 S.Ct. 483, 83 L.Ed. 1024 (1939). Only because the twenty-year period for which consent had been granted had expired could the city legitimately compel Delmarva's successor to leave its municipal territory. *Id.* at 267.

Seaford argues that in 1961, when it became empowered to expand its borders, Delmarva's franchise rights were extinguished. The home rule powers of Seaford are those of a sovereign, it is argued, and effectively give it the power to revoke any franchise granted by the State which was to be exercised within its territory, or even within one-half mile of its borders. 22 *Del.C.* § 802;[11] *See Dunn v. Mayor of*

---

11. 22 Delaware Code § 802. *Applicability of chapter; grant of power.*

Every municipal corporation in this State containing a population of at least 1,000 persons as shown by the last official federal decennial census may proceed as set forth in this chapter to amend its municipal charter and may, subject to the conditions and limitations imposed by this chapter, amend its charter so as to have and assume all powers

which, under the Constitution of this State, it would be competent for the General Assembly to grant by specific enumeration and which are not denied by statute. This grant of power does not include the power to enact private or civil law governing civil relationships except as an incident to an exercise of an independent municipal power, nor does it include power to define and provide for the punishment of a felony.

*Wilmington,* Del.Supr., 219 A.2d 153 (1966). This authority to serve outside its boundaries, it is argued, is in addition to its governmental power to annex. 22 *Del.C.* § 101.

■ Public utilities in Delaware are able to operate within city limits as long as they have the permission of the municipality. 26 *Del.C.* §§ 906, 907. That this is the law and the intent of the General Assembly since its enactment in 1899 is clear. There is nothing to indicate that the powers granted to home rule cities are deemed to supersede statutorily granted rights. In fact, the contrary is the rule. *City of Wilmington v. Lord,* Del.Super., 340 A.2d 182 (1975). Consequently, there is no authority to support the contention that by virtue of its limited home rule sovereignty Seaford was free to extinguish property rights owned by Delmarva either inside or outside of its borders without compensation.

The second distinction of the *Stillings* case is the nature of the service involved. In its brief, Delmarva argued that garbage collection differs from electrical service in the amount of capital investment involved, and that as a consequence, electrical service involves a different magnitude of rights. While it may be the case that providing electrical power may require a larger investment than trash removal, the difference in the respective rights which sets apart this case is the compulsion on the municipality to provide each service. The government of Winston–Salem was mandated by statute to extend garbage collection to its newly annexed areas in its governmental capacity. To the contrary, no such compulsion appears to exist on Seaford to extend electrical service to new residents. Seaford did not provide electrical service to everyone within one-half mile of its borders in 1961, or to all new residents of Seaford when the territory was annexed in 1981. It apparently was not compelled to do so by the annexation. Thus, these facts distinguish the *Stillings* case.

In summary, the granting authority for Delmarva's franchise was not restricted to only territory outside city limits, as was the Forsyth County authority. Secondly, Seaford has provided electrical service to new citizens at its discretion and did not extend electrical service as one of its police powers as mandated by the annexation. The *Stillings* case, therefore, does not apply to these facts, and we do not adopt its holding as dispositive of this case.

■ Seaford's sovereign power to expand its borders is controlled generally by the law on annexation. While annexation affects many property rights, it may not impair vested rights. 2 McQuillin, *Municipal Corporations* § 7.46.40 (3d ed.) (1988 Revised Volume). Many courts have held that annexation does not authorize an ouster of a franchisee from the annexed area without compensation. *Tri–County Elec. Ass'n., Inc. v. City of Gillette,* Wyo.Supr., 584 P.2d 995 (1978); *Unity Light & Power Co. v. City of Burley,* 92 Idaho 499, 445 P.2d 720 (1968); *Franklin Power & Light v. Middle Tenn. Elec. Mem. Corp.,* 222 Tenn. 182, 434 S.W.2d 829 (1968); *City of Jackson v. Creston Hills, Inc.,* 252 Miss. 564, 172 So.2d 215 (1965); *Pa. Water Co. v. City of Pittsburg,* 226 Pa. 624, 75 A. 945 (1910) (three justices dissenting); *Jersey City H. & P. St. Ry. Co. v. Borough of Garfield,* 68 N.J.L. 587, 53 A. 11 (1902). We hold, therefore, that the annexation did not *ipso facto* extinguish Delmarva's franchise rights to serve its existing customers in the annexed territory.

Seaford also argues that a decisive feature of this case is that the two customers chose to change their service to Seaford. In its decision granting summary judgment below, the Superior Court found this to be a significant fact. Seaford's power to extinguish Delmarva's franchise coupled with the customers' voluntary action eliminated any compensatory right that Delmarva may have had in the two accounts. We find this ruling to be contradicted by the public policy as to pioneer utilities as articulated by the Public Service Commission and by prior decisions of this Court.

■ As summarized above, the Public Service Commission seeks to restrict competition among utilities in order to protect

the public convenience and necessity. It has ruled that customer preference should not control the decision "whether public convenience and necessity requires a competing utility be given the right to serve in another utility's service territory." *In the Matter of the Application of Delmarva Power & Light Co. for a Certificate of Public Convenience and Necessity to Provide Electrical Service to Mallard Lakes,* Del.P.S.C., Dkt. 84–20, Cross, Hearing Examiner (July 12, 1985), *aff'd,* Del.P.S.C., Order No. 2685 (Nov. 5, 1985). In the case of the Dover Air Force Base, the Commission ruled that one customer desiring to change its service was not a sufficient showing of public necessity and convenience to warrant granting a certificate for Delmarva to replace the city of Dover as the provider. *City of Dover v. Del. Power & Light Co, Del.,* Del.P.S.C., 3 P.U.R.3d 181, 192 (1953). While it is the case that Seaford Light and Power Company is not subject to the jurisdiction of these decisions, we deem them to be significant because they express a policy which seeks to prevent chaotic competition among utilities. It is notable that this policy was applied by the Commission to favor the City of Dover, a non-regulated entity, protecting it as the pioneer utility serving the Dover Air Force Base. *Id.* We hold, therefore, that as a matter of policy, customer choice does not play a decisive role in determining the relative rights of providers of electric service.

### III.

In Delaware, as stated above, public utilities such as Delmarva are regulated by the Public Service Commission, whether they operate inside or outside the boundaries of municipalities. Their ability to serve customers within municipal borders, however, is additionally subject to the requirement of the consent of the municipality. This Court has described this power of consent to be that of conferring a franchise to a utility to operate within the municipality. *Eastern Shore Pub. Serv. Co. v. Town of Seaford,* Del.Supr., 2 A.2d 265, 268 (1938), *appeal dismissed,* 306 U.S. 616, 59 S.Ct. 483, 83 L.Ed. 1024 (1939). In this case, the Court must address for the first time whether this provision can be applied when a municipality annexes territory in which a public utility has been lawfully authorized to operate prior to the annexation. The language of the statute describes this consent power explicitly as a "condition precedent" to the use of a municipality's roads by a public utility. 26 *Del.C.* § 906(a). A public utility's use of the streets is subject to "regulations and taxation as may be *first* imposed by the corporate authorities of such cities and towns." 26 *Del.C.* § 906(b) (emphasis added). The unambiguous language of the statute and the particular facts of this case require the conclusion that the consent power possessed by Seaford cannot be applied retroactively so as to extinguish Delmarva's preexisting right to serve its prior customers once the area is annexed to Seaford. It has been established that Delmarva has been lawfully providing service to the area surrounding Seaford pursuant to a state-granted franchise and under the constraints and obligations imposed by its regulation by the Public Service Commission. In 1981 and 1982, Seaford annexed the territory involved in this case, extending its control and domain over these areas accordingly. As described in its Charter, it supplanted its authority for that of the county to regulate and maintain use of the streets and roadways now within its boundaries. 43 Del.Laws c. 184, § 32. There is nothing in the record to indicate that Seaford took any action at all with regard to Delmarva's continued service to customers in the newly annexed areas. If the consent power possessed by Seaford was to have any effect on this situation, it appears to the Court that action taken by Seaford in concert with the annexation would have presented a stronger argument. To the contrary, it appears that Seaford allowed Delmarva to continue serving its prior customers at Seaford's discretion, presumably because it benefitted Seaford at that time. We hold, therefore, that it was not the intent of the General Assembly by the consent provision to enable a municipality to oust franchisees which were lawfully operating outside the borders of the municipali-

ty prior to the annexation without any compensation for such ouster. As is the case with any other property owner in a newly annexed territory, however, Delmarva's franchise is now subject to regulations imposed by Seaford which are reasonably designed for public safety and protection in accordance with its police powers.

■■■ Seaford's extension of electrical service to the annexed territories does not appear to be a step mandated by its Charter. On the other hand, Delmarva is obligated not to abandon electrical services without being granted permission from the Commission. 26 *Del.C.* § 203A(c)(1). Seaford cannot use its authority as a governmental unit to place itself in a position where it can pick and choose among Delmarva's lawful customers so as to enhance its opportunities without compensating Delmarva for the taking. The Constitutions of the United States and of Delaware prohibit this. *See City of Los Angeles v. Los Angeles Gas & Elec. Co.*, 251 U.S. 32, 40 S.Ct. 76, 64 L.Ed. 121 (1919). For this reason, the grant of summary judgment by the Superior Court must be reversed, and the case remanded for further proceedings consistent with this opinion.

Upon remand, the court should consider the following matters of law. Seaford was not compelled by its Charter to serve the two customers and, therefore, it is not required by law to continue its service to them. It may return the customers and compensate Delmarva for any damages. If Seaford desires to initiate service within its boundaries, or to communities within one-half mile of its boundaries, to customers who are being served by Delmarva, it must pay Delmarva fair compensation. While this case does not involve new customers, we do not hold here that Seaford must pay Delmarva for new accounts which arise within the annexed territory where they were not already being served by Delmarva. *See Union Rural Elec. Assoc., Inc. v. Town of Frederick*, Colo.Supr., 670 P.2d 4 (1983).

We take note of the holding of the Superior Court in *City of Newark v. Delmarva Power and Light Co.*, Del.Super., 497 A.2d 785 (1985). In that case Newark sued Delmarva to condemn property such as lines and poles so as to begin electrical service to three customers whose property had been annexed by Newark. The court ruled that while Newark had the authority to condemn the property under its home rule power of eminent domain, the method by which it was valuing the property was erroneous. The court held that in addition to presenting evidence on the value of the tangible assets being taken, Delmarva could argue the value of its franchise rights, including the going concern value of the customers' accounts, the resultant loss in value to its franchise as a whole, and severance damages. *See also 0.089 of an Acre of Land v. State*, Del.Supr., 145 A.2d 76 (1958); *Bd. of Ed. v. 13 Acres of Land*, Del.Super., 131 A.2d 180 (1957); *City of Thibodaux v. La. Power & Light Co.*, 225 F.Supp. 657 (E.D.La.1963). In this case, the accounts of the Church and the Country Club are the only property involved. No poles, wires, or physical assets of value were taken. Thus, if Delmarva is to be compensated, it is on the basis of the value of its franchise rights alone. Here we have determined that Delmarva was serving these customers as the holder of a non-exclusive franchise, under the compulsion and protection of the Public Service Commission. We hold that this privilege constitutes a valuable right which cannot be taken by Seaford without compensation.

The decision of the Superior Court is REVERSED.